lead to absurd results. Due to their failure to fulfill a condition precedent, the Webers were effectively in no different position during the 2010 season than the area farmers who had no contract at all with North Loup. It cannot be assumed that the Legislature intended to impose criminal liability on persons who refuse to deliver water to those who have no right to receive it.

We conclude that the district court did not err in determining that North Loup was entitled to judgment as a matter of law with respect to the Webers' claims.

## V. CONCLUSION

For the reasons discussed, we affirm the judgment of the district court.

AFFIRMED.

———————

State of Nebraska ex rel. Patricia A. Loontjer, relator,
v. Honorable John A. Gale, Secretary of State
of the State of Nebraska, respondent.
___ N.W.2d ___

Filed September 5, 2014.    No. S-14-684.

1. **Courts: Justiciable Issues.** Ripeness is a justiciability doctrine that courts consider in determining whether they may properly decide a controversy.
2. **Courts.** The fundamental principle of ripeness is that courts should avoid entangling themselves, through premature adjudication, in abstract disagreements based on contingent future events that may not occur at all or may not occur as anticipated.
3. **Constitutional Law: Initiative and Referendum: Justiciable Issues.** Because the outcome of an election is a contingent future event, a challenge that a proposed ballot measure will violate the substantive provisions of the U.S. or Nebraska Constitution does not present a justiciable controversy. It is not ripe for judicial determination because the voters might vote to reject the measure.
4. **Constitutional Law: Initiative and Referendum.** A claim that a proposed ballot measure violates a constitutional or statutory rule that governs the form of the measure or the procedural requirements for its placement on the ballot is a challenge to the legal sufficiency of a ballot measure. Such challenges are ripe for resolution before an election.
5. **Constitutional Law: Initiative and Referendum: Justiciable Issues.** An alleged separate-vote violation under Neb. Const. art. XVI, § 1, challenges a

ballot measure's legal sufficiency and presents a justiciable controversy before an election.

6. **Constitutional Law: Initiative and Referendum: Public Officers and Employees.** The Secretary of State's statutory duties to provide the ballot form for the Legislature's proposed constitutional amendments and to certify its contents, coupled with his duties to supervise elections and decide disputed points of election laws, clearly require the Secretary to consider whether a proposed amendment complies with the separate-vote provision of Neb. Const. art. XVI, § 1.

7. **Public Officers and Employees: Statutes.** Power vested in a governmental body or officer carries with it the implied power to do what is necessary to accomplish an express statutory duty, absent any other law that restrains the implied power.

8. **Constitutional Law: Initiative and Referendum: Legislature: Public Officers and Employees.** The Secretary of State cannot determine the substantive merits of the Legislature's proposed constitutional amendment. But in a legal sufficiency challenge, he has a duty to reject a proposed amendment as legally defective for failing to satisfy form and procedural requirements. There is no requirement that the proposed amendment be "patently unconstitutional on its face" before the Secretary must act.

9. **Constitutional Law: Initiative and Referendum: Legislature.** The Legislature's independent proposals to amend the constitution must be presented to the voters for a separate vote even if they are proposed in a single resolution.

10. **Constitutional Law: Legislature.** The constitutional requirements for legislative bills do not apply to the Legislature's proposed amendments.

11. **Constitutional Law: Initiative and Referendum.** The "single subject" rule that applies to legislative bills under Neb. Const. art. III, § 14, does not apply to ballot measures for constitutional amendments.

12. **Constitutional Law.** It is a fundamental principle of constitutional interpretation that each and every clause within a constitution has been inserted for a useful purpose.

13. **Constitutional Law: Initiative and Referendum: Legislature.** The single subject rule for voter initiatives and the separate-vote provision for the Legislature's proposed amendments should be construed as imposing the same ballot requirements: A voter initiative or a legislatively proposed constitutional amendment may not contain two or more distinct subjects for voter approval in a single vote.

14. **Constitutional Law: Administrative Law: Initiative and Referendum.** The natural and necessary connection test that applies to proposed amendments for city charters and municipal ballot measures also applies to the single subject requirement for voter initiatives under Neb. Const. art. III, § 2, and the separate-vote provision of Neb. Cont. art. XVI, § 1.

15. **Initiative and Referendum.** Under a single subject ballot requirement, the general subject of a proposed ballot measure is defined by its primary purpose.

16. ____. Without a unifying purpose, separate proposals in a ballot measure necessarily present independent and distinct proposals that require a separate vote.

17. **Constitutional Law: Jurisdiction: Declaratory Judgments: Appeal and Error.** When a party has invoked the Nebraska Supreme Court's original jurisdiction under one of the causes of action specified in Neb. Const. art. V, § 2, the court may exercise its authority to grant requested declaratory relief under the Uniform Declaratory Judgments Act or injunctive relief.

18. **Mandamus.** A court issues a writ of mandamus only when (1) the relator has a clear right to the relief sought, (2) a corresponding clear duty exists for the respondent to perform the act, and (3) no other plain and adequate remedy is available in the ordinary course of law.

Original action. Writ of mandamus granted.

L. Steven Grasz and Mark D. Hill, of Husch Blackwell, L.L.P., for relator.

Jon Bruning, Attorney General, L. Jay Bartel, and Lynn A. Melson for respondent.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## I. SUMMARY

In April 2014, the Legislature passed L.R. 41CA,[1] a resolution to amend the Nebraska Constitution. Neb. Const. art. III, § 24, generally prohibits the Legislature from authorizing games of chance, but it contains an exception for live horseracing under specified conditions. L.R. 41CA would amend article III, § 24(4)(a), in two ways. First, it would permit wagering on "replayed" horseraces in addition to wagering on live horseraces. Second, it would specify how the Legislature must appropriate the proceeds from a tax placed on wagering for both live and replayed horseraces.

Secretary of State John A. Gale, respondent, denied a request to withhold the proposed amendment from the November 2014 general election ballot. The Secretary determined that the amendment was not facially invalid under the "separate-vote" provision of Neb. Const. art. XVI, § 1. After that, Patricia A. Loontjer, relator, applied for leave to

[1] See 2014 Neb. Laws, L.R. 41CA.

commence an original action in this court to keep the proposed amendment off the ballot. We granted the petition and expedited the proceeding.

We exercise original jurisdiction under Neb. Const. art. V, § 2, because this is a cause of action relating to revenue, in which the State has a direct interest, and because Loontjer has requested a writ of mandamus.[2] We hold as follows:

- We conclude that an alleged violation of the separate-vote provision of Neb. Const. art. XVI, § 1, presents a preelection justiciable issue for a proposed constitutional amendment.
- We also conclude that the separate-vote provision requires the Legislature to present constitutional amendments to voters in a manner that allows them to vote separately on distinct and independent subjects.
- Finally, because L.R. 41CA violates the separate-vote provision, we conclude that article XVI, § 1, bars its placement on the November 2014 general election ballot.

## II. BACKGROUND

### 1. Legislative Efforts to Authorize Wagering on Replayed Horseraces

Neb. Const. art. III, § 24(1), states that "[e]xcept as provided in this section, the Legislature shall not authorize any game of chance . . . ." Section 24(2) specifically authorizes the state lottery. And § 24(4) provides that the games-of-chance prohibition does not apply to wagering on live horseraces and specified bingo games. Subsection (4)(a) relates to horseracing. It currently authorizes the Legislature to enact "laws providing for the licensing and regulation of wagering on the results of horseraces, wherever run, either within or outside the state, by the parimutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure."

Article III, § 24, does not define "parimutuel" betting. Generally, it is a gambling system in which the bettor has

---

[2] See, *State ex rel. Stenberg v. Moore*, 253 Neb. 535, 571 N.W.2d 317 (1997); *State ex rel. Douglas v. Gradwohl*, 194 Neb. 745, 235 N.W.2d 854 (1975); *Anderson v. Herrington*, 169 Neb. 391, 99 N.W.2d 621 (1959).

a stake in all wagers placed on a race in proportion to the money that the bettor waged.[3] Section 2-1207 allows a licensee to deduct a percentage from all wagers placed on a race and divide the remaining pool among those holding winning tickets. The Legislature has authorized parimutuel betting on live horseraces at enclosed, licensed racetracks. The race can be conducted at that track or simulcast from another licensed track.[4] In 1988, the voters adopted an amendment to article III, § 24, to permit wagering on "horseraces, wherever run, either within or outside of the state, . . . when such wagering is conducted by licensees within a licensed racetrack enclosure."[5]

In 2010, three senators introduced a bill to authorize the State Racing Commission to "license and regulate parimutuel wagering on historic horseraces."[6] In the bill's statement of intent, the introducer stated that the bill would provide "an additional mode of horse race wagering inside the premises of a licensed horse racetrack" by allowing the operators to "install and operate Instant Racing Terminals."[7] But the Attorney General's office issued an opinion that this court would likely determine the bill was unconstitutional under article III, § 24.[8]

The Attorney General's office concluded that historical horseracing referred to a patented wagering system that was discussed by the Wyoming Supreme Court in a 2006 decision. That court held that instant racing parimutuel wagering terminals were illegal gambling devices and that the Wyoming Pari-mutuel Commission had no power to authorize them.[9] The

---

[3] See, Neb. Rev. Stat. § 2-1207 (Reissue 2012); *State ex rel. Stenberg v. Omaha Expo. & Racing*, 263 Neb. 991, 644 N.W.2d 563 (2002).

[4] See Neb. Rev. Stat. §§ 2-1224(2) and 2-1225(7) (Reissue 2012).

[5] See 1988 Neb. Laws, L.R. 15.

[6] See L.B. 1102, Judiciary Committee, 101st Leg., 2d Sess. (Jan. 21, 2010).

[7] See Introducer's Statement of Intent, L.B. 1102, Judiciary Committee, 101st Leg., 2d Sess. (Feb. 10, 2010).

[8] Att'y Gen. Op. No. 10009 (Mar. 29, 2010).

[9] See *Wyoming Downs Rodeo Events, LLC v. State*, 134 P.3d 1223 (Wyo. 2006).

Nebraska Attorney General's office explained the new wagering system:

> The "Instant Racing" system allows bettors to wager on the results of previously run or "historic" races through electronic "Instant Racing Terminals" ["IRTs"]. The machines reportedly can access over 200,000 historic races. Wagers are made by coin or currency. Players can utilize [a] limited Daily Racing Form [for] past performance data (i.e. winning percentages, average earnings per start, trainer and jockey success, etc.) provided in graphic form before making their selections. The data is provided in such a way that bettors cannot identify the exact race. The machines contain a video screen which allows bettors to view the entire race after placing their wagers, or only a short clip of the stretch run of the race.
>
>     . . . Unlike most parimutuel wagering, where many wagers are made on a single race, Instant Racing involves wagers on many different races. Winners receive graduated payoffs based on their correct selection of the order of finish. Payoffs are also determined by timing - the bettor who hits first receives the highest payoff.
>
> In appearance and operation, IRTs resemble slot machines or video lottery devices. The "bells and whistles" associated with slot machines or video lottery devices are all present (except for the pull-handle).[10]

The Attorney General's office concluded that wagering through instant racing terminals (IRT's) was inconsistent with the type of wagering allowed under article III, § 24. The opinion pointed out that § 24 allows bettors to wager on simulcast horseraces from another state, but not on races conducted at another time. Ultimately, the office concluded that because of the similarity between IRT's and slot machines, this court would probably agree with the Wyoming Supreme Court that IRT's were impermissible gambling devices. After this opinion

---

[10] Att'y Gen. Op. No. 10009, *supra* note 8.

was issued, the historic horseracing bill was indefinitely postponed in April 2010.[11]

In January 2013, Senator Scott Lautenbaugh introduced L.R. 41CA, the current proposed constitutional amendment to article III, § 24(4).[12] In his statement of intent, Senator Lautenbaugh stated that the proposed measure, together with a bill he was also introducing, would ensure the use of IRT's at horseracing facilities in Nebraska. The IRT's, as an additional mode of wagering on horseracing, would provide revenue to the state and its licensed racetracks.[13] L.R. 41CA would expand the type of wagering the Legislature can authorize to include "live or replayed" horseraces. Originally, the resolution did not appropriate any new or existing tax revenues.[14] Instead, the taxes and appropriations of tax revenues were set out in L.B. 590,[15] the bill that accompanied L.R. 41CA.

Currently, the Legislature places a tax on parimutuel wagering. Neb. Rev. Stat. § 2-1209 (Reissue 2012) authorizes the State Racing Commission to pay its own expenses and staff compensation out of these revenues first. It also requires the Commission to maintain a reserve fund that does not exceed 10 percent of the funds used for the commission's expenses. And any excess funds must be credited to the state's general fund.[16]

If it had passed, L.B. 590 would have immediately authorized the installation of IRT's. It would not have changed the existing tax scheme, but it would have imposed a separate and new tax on historical horseracing wagers. After paying administrative expenses, one-half of the new tax revenues would

---

[11] See Legislative Journal, 101st Leg., 2d Sess. 1229, 1467 (2010).

[12] See Legislative Journal, 103d Leg., 1st Sess. 280-81 (2013).

[13] See Introducer's Statement of Intent, L.R. 41CA, General Affairs Committee, 103d Leg., 1st Sess. (Feb. 11, 2013).

[14] See Legislative Journal, *supra* note 12.

[15] See L.B. 590, General Affairs Committee, 103d Leg., 1st Sess. (Jan. 23, 2013).

[16] See § 2-1209.

have been paid to the State Racing Commission's cash fund for equine therapy programs (for veterans and youths). The other half would have been credited to the Compulsive Gamblers Assistance Fund.[17]

After contentious floor debates, L.B. 590 was indefinitely postponed at Senator Lautenbaugh's request.[18] But the Legislature advanced L.R. 41CA to the select file[19] and carried it over to the next session.[20] In March 2014, Senator Lautenbaugh filed an amendment to L.R. 41CA.[21] Amendment 1910 included appropriations for all proceeds from taxes on "wagering by the parimutuel method."[22] Similar to the appropriation schemes under the current statutes and the unsuccessful L.B. 590, the proposed new appropriations under the amendment would require "regulatory expenses" to be paid first from the tax revenues.[23] But unlike the proposed new tax and appropriations under L.B. 590, amendment 1910 does not limit its proposed new appropriations to tax revenues from only historical horseracing wagers. Instead, amendment 1910 would also change the way that existing tax revenues from live horseracing wagers must be appropriated. That is, those revenues would not be used to maintain a reserve fund, and excess funds would not be credited to the state's general fund.

In April 2014, L.R. 41CA, as modified by amendment 1910, passed by the required three-fifths majority of the Legislature.[24] The final version would amend article III, § 24, as follows:

> (4)(a) Nothing in this section shall be construed to prohibit (a) the enactment of laws providing for the licensing and regulation of wagering on the results of live or

---

[17] See L.B. 590, General Affairs Committee, 103d Leg., 1st Sess. (Jan. 23, 2013).

[18] See Legislative Journal, *supra* note 12, 1st Sess. 652, 684.

[19] See *id*. at 683-84, 716-18.

[20] See Legislative Journal, 103d Leg., 2d Sess. 2, 69 (2014).

[21] See *id*. at 757.

[22] *Id*.

[23] *Id*.

[24] See *id*. at 1428-29.

<u>replayed</u> horseraces, wherever run, either within or outside of the state, by the parimutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure<u>. The state's proceeds from a tax placed on wagering by the parimutuel method shall be appropriated by the Legislature for the costs of regulating wagering by the parimutuel method and for the following purposes:</u>

<u>(i) Forty-nine percent of the money remaining after the payment of regulatory expenses shall be used for elementary and secondary education statewide;</u>

<u>(ii) Forty-nine percent of the money remaining after the payment of regulatory expenses shall be used to reduce property taxes statewide; and</u>

<u>(iii) Two percent of the money remaining after the payment of regulatory expenses shall be transferred to the Compulsive Gamblers Assistance Fund.</u>[25]

Section 2 of L.R. 41CA requires the resolution to be submitted to the electors with the following ballot language:

A constitutional amendment to provide for enactment of laws providing for licensing and regulation of wagering on live or replayed horseraces, wherever run, either within or outside of the state, by the parimutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure, and to require appropriation of certain parimutuel taxes for regulation of parimutuel wagering, for education, for property tax relief, and for the Compulsive Gamblers Assistance Fund.

For

Against[26]

## 2. Laws and Facts Relevant to Relator's
### Challenge to Proposed Amendment

Neb. Const. art. XVI, § 1, governs the procedure by which the Legislature may propose amendments to the constitution. Generally, a proposed amendment must be published and

---

[25] 2014 Neb. Laws, L.R. 41CA.

[26] See *id.*, § 2.

submitted to the electorate on a separate ballot for approval or rejection at the next general election or at a special election if called for by a four-fifths vote of the Legislature. And under the separate-vote provision, "[w]hen two or more amendments are submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately."[27]

In addition, except for special elections, Neb. Rev. Stat. § 49-202.01(1) (Reissue 2010) imposes a statutory requirement: The Executive Board of the Legislative Counsel must submit to the Secretary a clear, concise statement explaining the effect of a vote for or against a proposed constitutional amendment. The board must submit this statement 4 months before the general election at which the voters will decide whether to amend the constitution, and the statement must precede the proposed amendment on the ballot. Under Neb. Rev. Stat. § 32-801 (Reissue 2008), the Secretary must certify the contents of a statewide ballot 50 days before a primary or general election. Here, the parties stipulated that the general election takes place on November 4, 2014, and that the certification date falls on September 12, 2014.

They also stipulated that the Executive Board of the Legislative Council submitted the following statement to precede the proposed amendment:

> A vote FOR this constitutional amendment would authorize the Legislature to enact laws providing for licensing and regulation of wagering on live or replayed horseraces, wherever run, either within or outside of the state, by the pari-mutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure and require appropriation of certain parimutuel taxes for regulation of parimutuel wagering, for education, for property tax relief, and for the Compulsive Gamblers Assistance Fund.
>
> A vote AGAINST this constitutional amendment would not change existing provisions on wagering on the results of horseraces.

---

[27] See Neb. Const. art. XVI, § 1.

### 3. Secretary Rejects Challenge

In July 2014, Loontjer's counsel in this action asked the Secretary to exercise his authority to review the legal sufficiency of the proposed amendment. He contended in part that the measure violated the separate-vote provision of article XVI, § 1. He argued that L.R. 41CA presented at least two amendments: one that authorizes a new type of gambling on replayed horseraces, and one that directs tax revenues from new and currently authorized wagering to be used for property tax relief and education funding. He argued that some voters who strongly opposed the new form of gambling might strongly support redirecting existing tax revenues on parimutuel wagering to property tax relief. He argued that the Legislature was unconstitutionally presenting two separate and independent changes to the constitution for voters to approve or reject in a single vote. And he contended that the Secretary could decide a challenge to the legal sufficiency or facial constitutionality of a proposed amendment before submitting it to the electorate.

In a memorandum dated July 22, 2014, the Secretary denied Loontjer's counsel's request. He stated that this court's decisions have held that challenges to the substantive constitutionality of a proposed ballot issue are not ripe for deciding before an election. But he recognized that the Secretary can decide, before an election, whether a ballot measure is legally sufficient. He concluded that the challenge of whether the proposed amendment violated the separate-vote provision was a challenge to the legal sufficiency of the ballot measure.

But the Secretary noted that unlike Nebraska's statutes governing voter-initiated ballot measures, no statutes gave him the authority to address, before an election, the legal sufficiency of the Legislature's proposed constitutional amendments. Relying on a 1996 opinion from the Attorney General's office,[28] the Secretary concluded that this lack of statutory authority meant he could address constitutional defects in the Legislature's proposed amendments only if they were patently clear from the face of the petition.

---

[28] See Att'y Gen. Op. No. 96005 (Jan. 8, 1996).

The Secretary agreed that article XVI, § 1, is intended to prevent logrolling, which he described as the practice of enticing voters to vote for a proposition by combining a popular measure with a dissimilar measure and requiring voters to vote for or against the entire package. And the Secretary recognized that to constitute a single subject matter, the provisions of a proposed law must have a natural and necessary connection. But he concluded that our case law provided no clear answer as to whether L.R. 41CA satisfied the natural and necessary test. Because he believed our case law supported reasonable pro and con arguments to that question, he concluded that L.R. 41CA was not "patently unconstitutional on its face." The Secretary stated that he would place the proposed amendment on the November 2014 general election ballot "'unless restrained from doing so by the Courts.'"

## III. ANALYSIS

### 1. Justiciability

[1,2] Challenges to proposed ballot measures present an initial issue of ripeness, and we have not previously decided whether a separate-vote challenge can be decided before an election. Ripeness is a justiciability doctrine that courts consider in determining whether they may properly decide a controversy.[29] The fundamental principle of ripeness is that courts should avoid entangling themselves, through premature adjudication, in abstract disagreements based on contingent future events that may not occur at all or may not occur as anticipated.[30]

[3,4] Because the outcome of an election is a contingent future event, a challenge that a proposed ballot measure will violate the substantive provisions of the U.S. or Nebraska Constitution does not present a justiciable controversy. It is not ripe for judicial determination because the voters might vote to reject the measure.[31] In contrast, a claim that a

---

[29] *Pennfield Oil Co. v. Winstrom*, 276 Neb. 123, 752 N.W.2d 588 (2008).

[30] *Id.*

[31] See *Duggan v. Beermann*, 249 Neb. 411, 544 N.W.2d 68 (1996).

proposed ballot measure violates a constitutional or statutory rule that governs the form of the measure or the procedural requirements for its placement on the ballot is a challenge to the legal sufficiency of a ballot measure.[32] Such challenges are ripe for resolution before an election.[33]

For example, in *State ex rel. Lemon v. Gale*,[34] we decided a preelection challenge that two voter-initiated ballot measures to amend the constitution violated the resubmission clause of article III, § 2. The resubmission clause is a constitutional limitation on voter-initiated ballot measures, which clause prohibits the electorate from resubmitting the "same measure, either in form or in essential substance" more than once in 3 years. In *State ex rel. Lemon*, one ballot measure would have authorized casino gambling; the other would have required the Legislature to appropriate tax revenues from casino gambling for kindergarten through 12th grade education. The Secretary concluded that the measures were so similar to voter-initiated measures submitted to the electorate 2 years earlier that they violated the resubmission clause. He refused to place them on the ballot. In a mandamus action, the district court concluded that the casino measure was not barred by the constitution. On appeal, we held that the resubmission clause barred both measures.

In deciding that the controversy was justiciable, we explained that we were not deciding whether the measure would "violate one or more substantive provisions of the state or federal Constitution."[35] Instead, the issue was "whether the measure is legally sufficient to be submitted to the voters" under the resubmission clause.[36] And we relied, in part, on two concurring opinions in an earlier decision that had

---

[32] See, *State ex rel. Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006); *Lootnjer v. Robinson*, 266 Neb. 902, 670 N.W.2d 301 (2003); *Duggan, supra* note 31.

[33] See *id*.

[34] *State ex rel. Lemon, supra* note 32.

[35] *Id*. at 302, 721 N.W.2d at 355.

[36] *Id*.

concluded an alleged violation of the single subject require-
ment for voter-initiated measures presents a preelection jus-
ticiable issue.[37] We implicitly concluded that the rules were
similar in their restrictions of content or form. That is, under
these rules, a ballot measure's contents are considered only to
determine whether it complies with the separate-vote require-
ment, regardless of the measure's subject matter. The issue is
not whether the proposed measure's provisions violate sub-
stantive constitutional law.[38]

[5] Contrary to the Secretary's position, *State ex rel. Lemon*
is not distinguishable because it governs voter-initiated bal-
lot measures. Like the resubmission clause of article III, § 2,
the separate-vote provision of article XVI, § 1, is not focused
on whether a proposed constitutional amendment would
violate substantive constitutional laws—such as the Equal
Protection Clause or a prohibition against the impairment of
contracts. Instead, regardless of the measure's subject matter,
the separate-vote provision prohibits a ballot measure from
being presented to the voters unless its form requirements are
satisfied. The provision is directed at the manner of holding
the election itself. We conclude that an alleged separate-vote
violation challenges a ballot measure's legal sufficiency and
presents a justiciable controversy before an election.

## 2. Secretary Has Authority to Review the Legal
### Sufficiency of the Legislature's Proposed
### Constitutional Amendments Even for
### Defects That Are Not Obvious

The Secretary contends that unlike his statutory duty
to determine the legal sufficiency of voter-initiated bal-
lot measures, he has no clear statutory authority to review
the legal sufficiency of the Legislature's proposed consti-
tutional amendments. So he contends that the invalidity or

---

[37] See *Lootnjer, supra* note 32 (Hendry, C.J., concurring in result) (Wright,
J., concurring; Gerrard, J., joins).

[38] See *Stewart v. Advanced Gaming Tech.*, 272 Neb. 471, 723 N.W.2d 65
(2006).

unconstitutionality of the Legislature's proposed constitutional amendments must be "'patently' clear." We disagree that a heightened standard for legal defects applies.

First, the Secretary relies on our 1984 decision *State ex rel. Brant v. Beermann*[39] to support his argument that the invalidity of a proposed ballot measure must be patently clear on its face before he can review its validity. In that case, we considered a voter-initiated ballot measure. We set out a rule of facial invalidity and provided an example of a facially invalid proposal:

> Unless the subject of the proposed petition on its face is invalid or unconstitutional, [the Secretary] cannot pass upon the validity or construction of any proposed law, when the proposed petition is presented for filing pursuant to § 32-704. An example of the Secretary of State's determining the validity of an initiative measure would be found in an initiative petition proposing a statutory abolition of a constitutional office.[40]

Relying on this language, the Attorney General's office determined in 1996 that the Secretary had authority to reject a ballot measure only for obvious constitutional defects.[41]

But the example we cited in *State ex rel. Brant* shows that we assumed the Secretary could reject a proposed ballot measure for its substantive constitutional defects. To limit the substantive challenges that the Secretary could address, we set out narrowing principles, including the one above. In 1996, however, we held in *Duggan v. Beerman*[42] that a substantive challenge to a proposed ballot measure was not ripe for judicial decision before an election. So our implicit conclusion in *State ex rel. Brant* that the Secretary could only reject a proposed ballot measure for an obvious, *substantive* constitutional defect was abrogated by our later decision in *Duggan*.

---

[39] *State ex rel. Brant v. Beermann*, 217 Neb. 632, 350 N.W.2d 18 (1984).

[40] *Id.* at 637, 350 N.W.2d at 21.

[41] See Att'y Gen. Op. No. 96005, *supra* note 28.

[42] *Duggan, supra* note 31.

Although in a couple of our cases we have repeated the "facial invalidity" requirement,[43] we have never held that the Secretary cannot address a challenge to a ballot measure's legal sufficiency unless the defect is obvious on the face of the measure. Such a requirement would be contrary to our reasoning in *State ex rel. Wieland v. Beermann*.[44] There, we held that the Secretary had a ministerial duty to review his own records to determine whether explanatory statements describing the proposed amendments were timely filed, to withhold proposals that did not meet the filing deadline, and to supervise the conduct of general elections. We explained that the Secretary's duty to act was not discretionary just because he needed to make factual determinations to carry out his statutory duties. We noted that the Secretary also must make inquiries to determine the sufficiency of signatures collected on initiative petitions.

Our analysis in *State ex rel. Wieland* illustrates that a legal defect in a proposed ballot measure will frequently not be obvious. But if the Secretary has a duty to determine the legal sufficiency of a proposed ballot measure, the necessity of "[l]egal or factual determinations made at the outset of the inquiry" do not affect the nature of his duty.[45] We conclude that *State ex rel. Brant* has no application to a challenge that a ballot measure is legally defective in its failure to comply with rules governing its form or procedural requirements.

Next, the Secretary argues that chapter 32, article 14, of the Nebraska Revised Statutes more specifically authorizes him to review the legal sufficiency of voter-initiated ballot measures than does chapter 49, article 2, which governs constitutional amendments proposed by the Legislature. For example, the Secretary points to Neb. Rev. Stat. § 32-1409(3) (Reissue 2008), which gives him authority to "total the valid signatures and determine if constitutional and statutory requirements have been met." While § 32-1409(3) supports the Secretary's

---

[43] See, *Loontjer, supra* note 32 (Wright, J., concurring; Gerrard, J., joins); *Duggan, supra* note 31.

[44] *State ex rel. Wieland v. Beermann*, 246 Neb. 808, 523 N.W.2d 518 (1994).

[45] *Id.* at 815, 523 N.W.2d at 524.

position that he has statutory authority to review voter initiatives, that section is primarily aimed at rules governing the required signatures for voter-initiated ballot measures. And we have concluded that the Secretary's authority to determine the legal sufficiency of ballot measures exceeds these types of defects.[46]

Moreover, the Secretary's statutory authority to review voter-initiated ballot measures for their legal sufficiency is not as explicit as it was before 1995. As we noted in *Duggan*, the Legislature overhauled the election laws in January 1995.[47] Before then, Neb. Rev. Stat. §§ 32-703.01 and 32-704(3) (Reissue 1993) explicitly required the Secretary to determine if an initiative was valid and sufficient. And no corresponding statute exists under the current voter initiative statutes at chapter 32, article 14.

Instead, under Neb. Rev. Stat. § 32-1411 (Reissue 2008), the Secretary must place a measure on the ballot when it is "regularly and legally filed." Under Neb. Rev. Stat. § 32-1412 (Reissue 2008), if the Secretary refuses to place the measure on the ballot, then any resident may apply for a writ of mandamus from the district court for Lancaster County. This statute assumes that the Secretary can reject an initiative for failing to satisfy rules governing its presentation to the voters, but it imposes no explicit duty to make this determination. Nonetheless, we held in *State ex rel. Lemon* that the Secretary had authority to determine whether a voter-initiated ballot measure violated the resubmission clause under the Constitution. It is true that we noted the Secretary's authority to reject a proposed measure under § 32-1409(3). But more broadly, the Secretary's authority is consistent with the Secretary's duties under Neb. Rev. Stat. § 32-201 (Reissue 2008).

Chapter 32, article 2, of the Nebraska Revised Statutes deals with the Secretary's duties for the conduct of *all* statewide elections, and § 32-201 sets out his primary duty in that regard: "The Secretary of State shall decide disputed points of election

---

[46] See *State ex rel. Lemon, supra* note 32.

[47] See *Duggan, supra* note 31.

law. The decisions shall have the force of law until changed by the courts." And in *State ex rel. Wieland*, we stated that under Neb. Rev. Stat. §§ 32-1051 and 32-1052 (Reissue 1993), the Secretary had a clear statutory duty to "'decide disputed points of election law,'" and to "'supervise the conduct of primary and general elections in this state.'"[48]

Section 32-1051 is now § 32-201, and the Secretary's duty to supervise elections is now found at Neb. Rev. Stat. § 32-202(1) (Reissue 2008). Although the statutes governing the Legislature's proposed constitutional amendments are in chapter 49, article 2, of the Nebraska Revised Statutes, these provisions were also separate from the general election laws when we decided *State ex rel. Wieland*.[49] And contrary to the Secretary's argument, we find no reason to distinguish between his duties dealing with statutory deadlines and compliance with the separate-vote provision. Moreover, § 49-207 (Reissue 2010) requires the Secretary to provide the form for the ballot:

> Whenever at a session of the Legislature more than one amendment to the Constitution or proposition is submitted to a vote of the people, *it shall be the duty of the Secretary of State to provide the form of the ballots containing such propositions or proposed amendments, which are to be submitted to a vote of the people.* . . . If more than one amendment to the Constitution or proposition is received at the same time, they shall be submitted in the order they were approved by the Legislature.

It is true that part of § 49-207 clearly pertains to separate resolutions to amend the constitution. But the consecutive numbering required for separate proposals to amend the constitution does not negate the Secretary's statutory duty to provide the form for all the Legislature's proposed amendments.

Additionally, § 32-801 requires the Secretary to certify the contents of all statewide ballots. His certification of proposed ballot measures would be meaningless if this duty carried no

---

[48] *State ex rel. Wieland, supra* note 44, 246 Neb. at 816, 523 N.W.2d at 525.

[49] See Neb. Rev. Stat. ch. 49, art. 2 (Reissue 1993).

responsibility to ensure that they satisfied legal requirements for their presentation to the voters.

[6,7] Summed up, we conclude that the Secretary's statutory duties to provide the ballot form for the Legislature's proposed constitutional amendments and to certify its contents, coupled with his duties to supervise elections and decide disputed points of election laws, clearly require him to consider whether a proposed amendment complies with the separate-vote provision. Power vested in a governmental body or officer carries with it the implied power to do what is necessary to accomplish an express statutory duty, absent any other law that restrains the implied power.[50]

So, the Secretary incorrectly argues that he lacks clear statutory authority to address the legal sufficiency of the Legislature's proposed constitutional amendments before an election. He has authority to determine whether they meet form and procedural requirements. Accordingly, the Secretary also incorrectly concluded that because he lacked this authority, he can address such defects only if they are "'patently' clear" from the face of the petition. Instead, the standard that a challenger must satisfy to keep a voter-initiated amendment off the ballot should also be the standard that applies to the Legislature's proposed amendments. Applying the same standard to all proposed ballot measures is consistent with our holdings that under the Nebraska Constitution, the Legislature and electorate are coequal sources of legislation.[51]

[8] We hold that the Secretary cannot determine the substantive merits of the Legislature's proposed constitutional amendment. But in a legal sufficiency challenge, he has a duty to reject a proposed amendment as legally defective for failing to satisfy form and procedural requirements. There is no

[50] See, e.g., *Wetovick v. County of Nance*, 279 Neb. 773, 782 N.W.2d 298 (2010); *L. J. Vontz Constr. Co. v. City of Alliance*, 243 Neb. 334, 500 N.W.2d 173 (1993); 73 C.J.S. *Public Administrative Law and Procedure* § 109 (2004).

[51] See, e.g., *City of North Platte v. Tilgner*, 282 Neb. 328, 803 N.W.2d 469 (2011); *Stewart, supra* note 38.

requirement that the proposed amendment be "patently unconstitutional on its face" before the Secretary must act.

Having determined the justiciability of the issue and the Secretary's authority to determine whether a legislatively proposed amendment violates the separate-vote requirement, we turn to the meaning of that requirement.

### 3. Separate-Vote Provision Imposes a Single Subject Requirement for the Legislature's Proposed Amendments

The separate-vote provision requires that "[w]hen two or more amendments are submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately."[52] Lootnjer contends that L.R. 41CA violates this requirement because voters cannot separately vote on its separate provisions, i.e., its proposed amendment to permit a new form of gambling and its proposed amendment to restrict the Legislature's appropriation authority. By dissecting its appropriation requirements, Loontjer argues that L.R. 41CA presents several different proposals for the voters to decide and about which they could disagree. She contends that the separate-vote provision is akin to a single subject rule, which is intended to prohibit logrolling, and that L.R. 41CA fails to meet the "'natural and necessary connection'" test for determining whether a proposed measure presents a single subject for a single vote.

The Secretary does not dispute that the separate-vote provision constitutes a single subject rule for the Legislature's proposed constitutional amendments. But he contends that L.R. 41CA pertains to only one general subject: parimutuel wagering on replayed horseraces. He contends that both provisions of L.R. 41CA—authorizing wagering on replayed horseraces and requiring parimutuel tax proceeds from wagering on horseraces to be used for property tax relief and kindergarten through 12th grade education—have a natural and necessary connection to the same subject matter.

---

[52] See Neb. Const. art. XVI, § 1.

We agree with the parties that the separate-vote provision under article XVI, § 1, imposes the same requirements as the single subject provision under article III, § 2. But because we have not previously decided this issue, we take the time to explain our decision.

### (a) Independent Subjects Must Be Separately Presented to Voters

Under separate-vote provisions in state constitutions, courts have almost invariably characterized unrelated subject matters within a single proposition as separate amendments that must be submitted to the voters separately.[53] An early Wisconsin case influenced many other state courts. In *State ex rel. Hudd v. Timme*,[54] the Wisconsin Supreme Court rejected an argument that any change to an existing constitutional provision and any new provision must be considered a separate amendment to be voted on separately in a ballot. It reasoned that if each provision of a single plan had to be separately submitted to the voters and a crucial provision failed, the provisions that passed might be effectively defeated. It pointed out that in amendments under consideration, the proposals to change the legislative session from annual to biennial meetings was intimately connected to the provision to change a legislator's tenure from 1 to 2 years. Otherwise, some legislators would have no duties. Voter approval of only one provision would be absurd, so the provisions should stand or fall together. Similarly, the proposed increase in legislators' salaries, while not intimately connected to the session change, was sufficiently connected because the legislators' duties would be enlarged. The court set forth the following rule:

> We think amendments to the constitution, which the [separate-vote provision] requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to

---

[53] See Annot., 94 A.L.R. 1510 (1935).

[54] *State ex rel. Hudd v. Timme*, 54 Wis. 318, 11 N.W. 785 (1882).

constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. . . . [Legislators] are not compelled to submit as separate amendments the separate propositions necessary to accomplish a single purpose.[55]

And the Arizona Supreme Court pointed out in 1934 that numerous early state court decisions cited the Wisconsin case with approval.[56] Agreeing with the Wisconsin court, it held that "'to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other.'"[57]

[9-11] This court has decided only one case under the separate-vote provision of article XVI, § 1. That decision was issued in 1889 when the separate-vote provision was found at Neb. Const. art. XV, § 1 (1875), and the Legislature had two houses. But *In re Senate File No. 31*[58] established two important points that are relevant here. First, it illustrates that the Legislature's independent proposals to amend the constitution must be presented to the voters for a separate vote even if they are proposed in a single resolution. However, the proposals under consideration were obviously contrary to each other, so the case does not give much guidance for determining independent subjects. Second, the court held that the constitutional requirements for legislative bills do not apply to the Legislature's proposed amendments. Thus, the "single subject" rule that applies to legislative bills under article III, § 14, does not apply to ballot measures for constitutional amendments.

---

[55] *Id*. at 336-37, 11 N.W. at 791.

[56] See *Kerby v. Luhrs*, 44 Ariz. 208, 36 P.2d 549 (1934). See, also, 94 A.L.R., *supra* note 53.

[57] *Kerby, supra* note 56, 44 Ariz. at 217, 36 P.2d at 553.

[58] *In re Senate File No. 31*, 25 Neb. 864, 41 N.W. 981 (1889).

### (b) Single Subject Rule for Legislative
### Bills Does Not Apply to
### Proposed Amendments

Other courts have held that the same standard that governs single subject rules for ballot measures also applies to separate-vote rules for constitutional amendments.[59] Like single subject rules, a separate-vote provision is often said to be aimed at the practice of logrolling.[60] We have said logrolling is the practice of combining dissimilar propositions into one proposed amendment so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately.[61] It is sometimes described as including favored but unrelated propositions in a proposed amendment to ensure passage of a provision that might otherwise fail.[62]

As explained below, we conclude that under the Nebraska Constitution, the single subject rule for proposed voter initiatives should be the same as the separate-vote rule for the Legislature's proposed amendments. But consistent with our decision in *In re Senate File No. 31*, we conclude that the single subject rule for legislative enactments has no application here. That provision is found in article III, § 14, which provides that "[n]o bill shall contain more than one subject . . . ." We construe this requirement quite liberally: "If an act has but one general object, no matter how broad that object may be, and contains no matter not germane thereto, and the

---

[59] See, *Andrews v. Governor of Maryland*, 294 Md. 285, 449 A.2d 1144 (1982); *Missourians to Protect Init. Proc. v. Blunt*, 799 S.W.2d 824 (Mo. 1990); *In re Initiative Petition No. 314*, 625 P.2d 595 (Okla. 1980).

[60] See, e.g., *Kerby, supra* note 56; *Andrews, supra* note 59; *State ex rel. Clark v. State Canvassing Bd.*, 119 N.M. 12, 888 P.2d 458 (1995).

[61] *City of North Platte, supra* note 51; *City of Fremont v. Kotas*, 279 Neb. 720, 781 N.W.2d 456 (2010), *abrogated in part on other grounds, City of North Platte, supra* note 51.

[62] See, *Advisory Opinion re Use of Marijuana*, 132 So. 3d 786 (Fla. 2014); *Carter v. Burson*, 230 Ga. 511, 198 S.E.2d 151 (1973).

title fairly expresses the subject of the bill, it does not violate Article III, section 14, of the Constitution."[63]

But as Chief Justice Hendry pointed out in 2003, this court has previously recognized that a stricter standard should apply when considering the validity of a constitutional amendment, as distinguished from a legislative bill to enact or amend a statute.[64] In *State, ex rel. Hall, v. Cline*,[65] we held that the Legislature's proposed amendment was not validly adopted when the Legislature followed a statute for publishing notice of the vote to amend, but the statutory requirements did not comply with the constitutional requirements for notice. In considering whether the Legislature had substantially complied with constitutional requirements, we stated that a court should "consider the seriousness of the business in which we are engaged. A legislative act may be amended or repealed at any succeeding session of the Legislature. A constitutional provision is intended to be a much more fixed and permanent thing."[66]

Similarly, in *Omaha Nat. Bank v. Spire*,[67] we stated that the significant difference between labeling an initiative petition as a proposed statute or constitutional amendment would obviously affect whether a petition signer or voter would support the initiative:

> The differences between a law enacted by the initiative procedure and an amendment are obvious and great. While a law enacted by the initiative process may not be vetoed by the Governor of the state (article III, § 4), any law may later be repealed by the Legislature. An amendment to the Constitution, on the other hand, may not be repealed by the Legislature, but only by the people in a subsequent amendment to the Constitution.

[63] *Anderson v. Tiemann*, 182 Neb. 393, 408-09, 155 N.W.2d 322, 332 (1967).

[64] See *Loontjer, supra* note 32 (Hendry, C.J., concurring in result), quoting *State, ex rel. Hall, v. Cline*, 118 Neb. 150, 224 N.W. 6 (1929).

[65] See *State, ex rel. Hall, supra* note 64.

[66] *Id.* at 155, 224 N.W. at 8.

[67] *Omaha Nat. Bank v. Spire*, 223 Neb. 209, 218-19, 389 N.W.2d 269, 276 (1986).

Like the labeling of an initiative petition, the separate-vote provision of article XVI, § 1, is a rule intended to avoid voter confusion when deciding whether to support a proposed change in the constitution. But more important, it is intended to prevent the practice of logrolling in amending the State's fundamental law. Because constitutional amendments are difficult to change once enacted, we hold that the liberal single subject standard that applies to legislative bills under article III, § 14, does not apply to proposed constitutional amendments. We now turn to what that standard should be.

### 4. Natural and Necessary Test Applies to Separate-Vote Provision

#### (a) History of Constitutional Amendments Shows Single Subject Requirements for Voter Initiatives Should Govern Legislature's Proposed Amendments

Article III, § 2, governs voter-initiated proposals for laws and constitutional amendments and imposes two form requirements that are relevant here: "The constitutional limitations as to the scope and subject matter of statutes enacted by the Legislature shall apply to those enacted by the initiative. Initiative measures shall contain only one subject." In contrast, the separate-vote requirement of article XVI, § 1, for the Legislature's proposals provides that "[w]hen two or more amendments are submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately." But as explained, despite the different language of these provisions, single subject and separate-vote ballot rules are aimed at the same logrolling problem. This conclusion is supported by a 1998 amendment to article III, § 2.

The requirement in article III, § 2, that voter-initiated statutes shall be governed by the same constitutional limitations on their scope and subject matter as statutes enacted by the Legislature has been part of the Constitution since 1912.[68] So the single subject requirement that applies to legislative bills also applies to voter-initiated statutes.

---

[68] See 1911 Neb. Laws, ch. 223, § 1A, p. 671.

[12] But the second sentence of the quoted requirements for initiatives—i.e., that initiative measures shall contain only one subject—was adopted by the voters in 1998.[69] Because it was added later, it necessarily implies a requirement that exceeds the requirement that the subject matter of initiatives shall be subject to the same requirements as legislative enactments. It is a fundamental principle of constitutional interpretation that each and every clause within a constitution has been inserted for a useful purpose.[70] And the legislative history of the resolution proposing the amendment shows that it was intended to equalize the requirements for ballot measures proposed by the voters and constitutional amendments proposed by the Legislature.

The amendment was apparently a response to two opinions from the Attorney General in 1995 and 1996.[71] In short, the Attorney General concluded that we would probably apply the same test to all constitutional amendments—whether proposed by the Legislature or the voters—and that we would require a separate vote on its provisions unless they met the test for a single subject. But at that time, article III, § 2, did not explicitly include a separate-vote provision or a single subject provision. The committee hearing shows that senators were concerned about the potential for voter confusion and fraud in the initiative process. The amendment was intended to clarify that all ballot measures to enact or change laws or constitutional provisions, whether voter initiatives or legislatively proposed constitutional amendments, were subject to the same requirement of presenting only one subject to the electorate for a single vote.[72]

[13] In sum, our constitutional history and the opinions of other state courts support our conclusion that the single

---

[69] See 1997 Neb. Laws, L.R. 32CA.

[70] *Banks v. Heineman*, 286 Neb. 390, 837 N.W.2d 70 (2013).

[71] See Att'y Gen. Ops. Nos. 95089 (Nov. 13, 1995) and 96005, *supra* note 28.

[72] See Government, Military and Veterans Affairs Committee Hearing, L.R. 32CA, 95th Leg., 1st Sess. (Jan. 24, 1997).

subject rule for voter initiatives and the separate-vote provision for the Legislature's proposed amendments should be construed as imposing the same ballot requirements: A voter initiative or a legislatively proposed constitutional amendment may not contain two or more distinct subjects for voter approval in a single vote.

### (b) Natural and Necessary Connection Test Applies to All Single Subject Ballot Requirements

Our conclusion that all ballot measures for laws or constitutional amendments are limited by the requirement that they present only one subject matter to the voters does not end our analysis. We have never decided what test should apply for the single subject requirement under article III, § 2 (for voter-initiated proposals), or article XVI, § 1 (for the Legislature's proposed amendments). But in *Loontjer v. Robinson*,[73] three concurring justices opined that our decision in *Munch v. Tusa*[74] should govern the single subject requirement.

In *Munch*, we considered the validity of a proposed amendment to a city charter. We adopted a rule that courts have applied to state constitutional amendments. We cited a general rule providing that if the separate provisions of a proposed amendment are all "'germane'" to the general subject matter, they may be submitted to the voters in a single vote.[75] And we cited a case concluding that the controlling consideration is an amendment's singleness of purpose and the relationship of the details to its general subject. We adopted the following test for the single subject requirement: "[W]here the limits of a proposed law, having natural and necessary connection with each other, and, together, are a part of one general subject, the proposal is a single and not a dual proposition."[76]

---

[73] See *Loontjer, supra* note 32 (Hendry, C.J., concurring in result) (Wright, J., concurring; Gerrard, J., joins).

[74] *Munch v. Tusa*, 140 Neb. 457, 300 N.W. 385 (1941).

[75] *Id.* at 463, 300 N.W. at 389.

[76] *Id.*

We have also applied a common-law single subject test to municipal voter initiatives: "The common-law single subject rule of form that we adopted in *Drummond* [*v. City of Columbus*[77]] preserves the integrity of the municipal electoral process by invalidating proposed ordinances that require voters to approve distinct and independent propositions . . . ."[78] We reasoned that "if a proposed ballot measure combines two distinct proposals so that voters are compelled to vote for or against both when they might not do so if separate questions were submitted, then they cannot express a clear preference on both proposals."[79] We held that

> a proposed municipal ballot measure is invalid if it would (1) compel voters to vote for or against distinct propositions in a single vote—when they might not do so if presented separately; (2) confuse voters on the issues they are asked to decide; or (3) create doubt as to what action they have authorized after the election.[80]

The first component of the test for municipal ballot measures reflects the prohibition against logrolling that is the primary purpose of the separate-vote provision. And we specifically stated that "a municipal ballot measure with separate provisions does not violate the single subject rule if the provisions have *a natural and necessary connection with each other and together are part of one general subject*."[81]

[14] It would be a strange result if we were more concerned about the integrity of municipal elections than state-wide votes to amend the fundamental law of Nebraska. And other courts agree that separate provisions in proposed constitutional amendments must be closely related in purpose to be presented

---

[77] *Drummond v. City of Columbus*, 136 Neb. 87, 285 N.W. 109 (1939).

[78] *City of North Platte, supra* note 51, 282 Neb. at 348, 803 N.W.2d at 486-87.

[79] *Id.* at 349, 803 N.W.2d at 487.

[80] *Id.*

[81] *Id.* at 350, 803 N.W.2d at 487 (emphasis supplied), citing *City of Fremont, supra* note 61.

to the electorate for a single vote.[82] We conclude that the natural and necessary connection test that applies to proposed amendments for city charters and municipal ballot measures also applies to the single subject requirement for voter initiatives under article III, § 2, and the separate-vote provision of article XVI, § 1. We turn to its application here.

### 5. Application of Natural and Necessary Connection Test

To recap, Loontjer contends that L.R. 41CA violates the natural and necessary connection test because voters cannot separately vote on its separate provisions to permit a new form of gambling and to change the appropriation of taxes collected from parimutuel wagering.

The Secretary contends that L.R. 41CA does not violate the natural and necessary connection test because its "broad, general subject matter" is parimutuel wagering on horseracing and all aspects of the amendment have a natural and necessary connection to this general subject matter.[83]

[15] Of course, whether a proposed amendment's provisions deal with a single subject matter depends on how narrowly or broadly the subject matter is defined. But we reject the Secretary's argument that the subject matter of L.R. 41CA is broad enough to encompass any topic connected to parimutuel wagering related to horseracing. Under this reasoning, the Legislature could propose in a single amendment to change any law dealing with a subject as broad as gambling, or the organization of government or schools. Instead, as we said in *Munch*, "the controlling consideration in determining the singleness of an amendment is its singleness of purpose and the relationship of the details to the general subject."[84] Clearly,

---

[82] See, e.g., *McLaughlin v. Bennett*, 225 Ariz. 351, 238 P.3d 619 (2010); *Moore v. Shanahan*, 207 Kan. 645, 486 P.2d 506 (1971); *Cambria v. Soaries*, 169 N.J. 1, 776 A.2d 754 (2001); *Pennsylvania Prison Soc. v. Com.*, 565 Pa. 526, 776 A.2d 971 (2001).

[83] Reply brief for respondent at 2.

[84] *Munch, supra* note 74, 140 Neb. at 463, 300 N.W. at 389.

the intent of this rule was to clarify that under a single subject ballot requirement, the general subject of a proposed ballot measure is defined by its primary purpose, and the facts of *Munch* support that conclusion.

In *Munch*, a city council proposed an amendment to the city's charter to create a uniform system of pensions for firefighters and police officers. The employees' pensions were set out in different articles of the charter, and the firefighters had previously received better pension benefits. So to equalize the plans, the amendment necessarily proposed several changes. But all the amendment's provisions were closely related to the amendment's single purpose "to place the firemen and policemen of the city on the same pension basis."[85] We rejected the plaintiff's argument that the amendment presented a dual proposition and that voters should be able to decide whether to change each plan separately. We concluded that voters were asked to decide a single proposition, i.e., whether to adopt a unified pension fund plan.

In contrast, we held that a municipal ballot measure in *City of North Platte v. Tilgner*[86] violated the common-law single subject rule because the voters were asked to approve of distinct and independent propositions in a single vote. There, the city had previously approved an occupation tax to pay for a visitor center and indefinitely fund its operation. It then entered into an option contract to purchase a visitor center from a private group, and the private group obtained a loan to fund the project. The initiative's proponents sought to amend the occupation tax ordinance so that tax revenues could only be used to pay off the loan to fund the project. After the debt was retired, the initiative would have prohibited the city from using the revenues to operate the center. Instead, it would have required the city to use the revenues for property tax relief.

We concluded that the two proposals—prohibiting the use of an occupation tax for a visitor center's operating expenses and

---

[85] *Id.* at 459, 300 N.W. at 387.

[86] *City of North Platte, supra* note 51.

requiring the city to use the revenues for property tax relief—
did not have a natural and necessary connection:

> These amendments were not separate provisions of
> the same law. But even if they could be construed as
> such, we conclude that they presented independent and
> distinct proposals instead of having a natural and neces-
> sary connection. . . . Because the petition presented dis-
> tinct but dual propositions for a single vote, voters could
> not express a preference on either without approving or
> rejecting both. Because the appellants' referendum peti-
> tion would not permit voters to express a clear preference
> on dual propositions, it violated the single subject rule
> and was invalid.[87]

[16] Our conclusion in *City of North Platte* that the ini-
tiative's proposals were not separate provisions of the same
law under the single subject requirement was clearly tied
to their lack of any unifying purpose. Without a unifying
purpose, separate proposals in a ballot measure necessar-
ily present independent and distinct proposals that require a
separate vote.

Here, the Legislature's primary purpose in L.R. 41CA is to
legalize a new form of wagering under Neb. Const. art. III,
§ 24. That purpose is apparent from the text of the proposed
amendment and its legislative history. Senator Lautenbaugh
and other proponents argued at the committee hearing that
the proposed amendment would save jobs in the struggling
horseracing industry by allowing yearlong wagering at race-
tracks. Neither the amendment's text, the statement of intent,[88]
nor the legislative history showed that a primary purpose for
the amendment was to create new funding for property tax
relief and education by requiring that all tax revenues from
parimutuel wagering be used for such purposes. The possibility
of using existing parimutuel tax revenues for property tax relief
and education was not even proposed until the resolution faced

---

[87] See *id*. at 351, 803 N.W.2d at 488.

[88] See Introducer's Statement of Intent, L.R. 41CA, General Affairs
Committee, 103d Leg., 1st Sess. (Feb. 11, 2013).

substantial opposition from some members of the Legislature. So the question is whether the proposal to use tax revenues from parimutuel wagering for property tax relief and education had a natural and necessary connection to legalizing a new form of wagering.

The answer is no. The appropriation proposal's only connection to the wagering proposal was to enhance the odds that voters would approve the new form of wagering. Many voters who might oppose proposals for new forms of wagering, standing alone, might nonetheless want new funding for property tax relief and kindergarten through 12th grade education. But they would be presented with a take-it-or-leave-it proposition. And this type of proposition is at the heart of the prohibition against logrolling. Conversely, even voters who would support the new type of wagering might prefer that the parimutuel tax revenues continue to be credited to the state's general fund, instead of devoted exclusively to property tax relief and education.

That voters might reasonably diverge on these separate proposals was amply illustrated in 1991, when the Legislature presented two *separate* ballot issues for the 1992 general election. The first ballot measure asked voters to authorize a state lottery. The second one asked voters to approve a specified distribution of the funds, if the lottery were approved.[89] The voters approved the first proposal, but not the second. Later, in 2004, the Legislature successfully passed a proposal to amend the constitution to appropriate lottery funds under the current method.[90]

The 1992 election illustrates that even if a majority of voters want to authorize a new form of wagering, they would not necessarily agree on the appropriations of tax revenues from it. That election also shows that the Legislature had previous experience with the proper means of presenting voters with distinct and independent proposals. We hold that because L.R. 41CA's provisions did not have a natural and necessary

---

[89] See 1991 Neb. Laws, L.R. 24CA.

[90] See, Neb. Const. art. III, § 24(3); 2004 Neb. Laws, L.R. 209CA.

connection, the Legislature was required to present the proposals to the voters for separate votes.

## 6. Secretary Must Withhold L.R. 41CA
### From the Ballot

In Loontjer's petition, she sought a writ of mandamus requiring the Secretary to deny certification and withhold the proposed amendment from the ballot. Under the Uniform Declaratory Judgments Act,[91] she also sought a declaration that the ballot language was invalid for three reasons: (1) the ballot language violates the separate-vote provision under Neb. Const. art. XVI, § 1; (2) the explanatory statement and ballot title violates the statutory requirements under § 49-202.01(1); and (3) the ballot language violates the free election clause under Neb. Const. art. I, § 22. Finally, she sought attorney fees and costs under Neb. Rev. Stat. §§ 25-2165 (Reissue 2008) and 25-21,158.

[17] We granted jurisdiction for an original cause of action involving revenue, in which the State has a direct interest, and a request for a writ of mandamus. When a party has invoked our original jurisdiction under one of the causes of action specified in Neb. Const. art. V, § 2, we may exercise our authority to grant requested declaratory relief under the Uniform Declaratory Judgments Act or injunctive relief.[92]

[18] Although the appropriate relief might be characterized in part as declaratory or injunctive, Loontjer argues that the Secretary was required by law to refuse to certify the Legislative proposal for placement on the November 2014 ballot, that he refused, and that this court should compel him to do so. Thus, she seeks a writ of mandamus. A court issues a writ of mandamus only when (1) the relator has a clear right to the relief sought, (2) a corresponding clear duty

---

[91] See Neb. Rev. Stat. §§ 25-21,149 to 25-21,164 (Reissue 2008).

[92] See, e.g., *Omaha Expo. & Racing, supra* note 3; *State ex rel. Wieland v. Moore*, 252 Neb. 253, 561 N.W.2d 230 (1997); *State ex rel. Stenberg v. Douglas Racing Corp.*, 246 Neb. 901, 524 N.W.2d 61 (1994); *Henry v. Rockey*, 246 Neb. 398, 518 N.W.2d 658 (1994); *State, ex rel. Smrha, v. General American Life Ins. Co.*, 132 Neb. 520, 272 N.W. 555 (1937).

exists for the respondent to perform the act, and (3) no other plain and adequate remedy is available in the ordinary course of law.[93]

Because we have held that the Secretary had the duty to determine whether a legislatively proposed amendment violates the separate-vote requirement, that the Legislature was required to present L.R. 41CA's proposals to the voters for separate votes, and that the resolution does not satisfy that requirement, we have recognized that Loontjer had a clear right to the relief she sought and that the Secretary had a corresponding clear duty to perform the act—that is, to refuse to certify the proposal for submission to the voters at the November 2014 election. The Secretary does not contend that Loontjer had any other plain and adequate remedy available to her in the ordinary course of law, and we also conclude that she did not. Thus, she has established all of the elements of mandamus and is entitled to a writ of mandamus requiring the Secretary to deny certification and withhold the proposed amendment from the ballot. Because we conclude that the resolution is unconstitutional under the separate-vote provision, we do not address Loontjer's additional claims that it was invalid because it violated the free election clause and because the accompanying explanatory statement was legally insufficient.[94]

## IV. CONCLUSION

We conclude that L.R. 41CA violates the separate-vote provision of Neb. Const. art. XVI, § 1. We express no opinion on the substantive merits of either provision of the proposal. We issue a writ of mandamus directing the Secretary to not certify the proposal presented by L.R. 41CA for placement on the ballot for the November 2014 general election and to withhold the proposed amendment from the ballot.

WRIT OF MANDAMUS GRANTED.

---

[93] *Mid America Agri Products v. Rowlands*, 286 Neb. 305, 835 N.W.2d 720 (2013).

[94] See *J.M. v. Hobbs, ante* p. 546, 849 N.W.2d 480 (2014).