Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/25/2020 08:07 AM CDT

State of Nebraska ex rel. M. Lynne McNally and
Keep the Money in Nebraska, relators, and
Nebraska Horsemen's Benevolent & Protective
Association, Inc., et al., relators-intervenors,
v. Robert B. Evnen, Secretary of State of
the State of Nebraska, respondent, and
Dr. Richard Loveless, and Ann Zohner
and Todd Zohner, wife and husband,
respondents-intervenors.

___ N.W.2d ___

Filed September 10, 2020.    No. S-20-612.

1. **Constitutional Law: Initiative and Referendum.** The right of initiative is precious to the people and one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter.
2. ____: ____. The power of initiative must be liberally construed to promote the democratic process, and provisions authorizing the initiative should be construed in such a manner that the legislative power reserved in the people is effectual.
3. **Constitutional Law.** A constitution represents the supreme written will of the people regarding the framework for their government.
4. **Constitutional Law: Initiative and Referendum.** The people of Nebraska may amend their Constitution in any way they see fit, provided the amendments do not violate the federal Constitution or conflict with federal statutes or treaties.
5. **Initiative and Referendum: Appeal and Error.** The Nebraska Supreme Court makes no attempt to judge the wisdom or the desirability of enacting initiative amendments.
6. **Initiative and Referendum: Intent.** The interests that propel both proponents and opponents of initiative petitions may often involve self-interest rather than the public interest. But a court's focus in deciding whether an initiative petition reaches the voters must be on the actual law proposed by the petition, not on the motives that may lie behind

it; the voters may consider those motives in deciding how they vote on the petition.

7. **Constitutional Law: Initiative and Referendum.** A purpose of the language in Neb. Const. art. III, § 2, that "[i]nitiative measures shall contain only one subject" is to avoid logrolling, which is the practice of combining dissimilar propositions into one proposed amendment so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately.

8. **Initiative and Referendum.** Where the limits of a proposed law, having natural and necessary connection with each other, and, together, are a part of one general subject, the proposal is a single and not a dual proposition.

9. **Constitutional Law: Initiative and Referendum: Intent.** The controlling consideration in determining the singleness of a subject for purposes of article III, § 2, of the Nebraska Constitution is its singleness of purpose and relationship of the details to the general subject, not the strict necessity of any given detail to carry out the general subject. The general subject is defined by its primary purpose.

10. **Initiative and Referendum.** When initiatives are presented separately, even if on the same ballot, a voter has the option to vote for one initiative but not the other, even if the initiatives have some connection to one another. Because voters can vote differently on each separate initiative, single subject review should focus on the specific initiative being reviewed without reference to the content of another initiative that is submitted separately.

Original action. Writ of mandamus granted.

Andre R. Barry and John F. Zimmer, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for relators.

Douglas J. Peterson, Attorney General, James A. Campbell, Solicitor General, Ryan S. Post, L. Jay Bartel, and Lynn A. Melson for respondent.

David A. Lopez and Kyle J. Gilster, of Husch Blackwell, L.L.P., for intervenor Dr. Richard Loveless.

Stephen D. Mossman, J.L. Spray, and Joseph A. Wilkins, of Mattson Ricketts Law Firm, for intervenors Ann Zohner and Todd Zohner.

Jefferson Downing, of Keating, O'Hara, Nedved & Peter, P.C., L.L.O., for amicus curiae Gambling With the Good Life, Inc.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, and FREUDENBERG, JJ., and WELCH, Judge.

MILLER-LERMAN, J.

NATURE OF CASE

M. Lynne McNally and Keep the Money in Nebraska (collectively McNally), along with other sponsors, filed three proposed ballot initiative petitions with Nebraska Secretary of State Robert B. Evnen (the Secretary). Generally, the first initiative would amend the prohibition against gambling contained in Nebraska Const. art. III, § 24, by permitting enactment of an exception which would authorize games of chance conducted within licensed racetrack enclosures; the second initiative would enact certain statutes and amend certain existing statutes to regulate games of chance operated by licensed gaming operators within licensed racetrack enclosures; and the third initiative would enact statutes that impose a tax on revenues from games of chance and specify how such taxes would be distributed.

After signatures had been collected, the Secretary received letters objecting to the initiatives and asking that they be withheld from the ballot due to claimed legal insufficiencies. Separate letters were received from Dr. Richard Loveless and from Ann Zohner and Todd Zohner.

The Secretary requested and received additional letters from the sponsors and from the objectors, and the Secretary thereafter granted the objectors' request to withhold the proposed initiatives from the November 3, 2020, general election ballot. The Secretary generally determined that each initiative was facially invalid under the "single subject" provision of Neb. Const. art. III, § 2. The Secretary further determined that even if either the regulatory initiative or the tax initiative was

in itself legally sufficient, both initiatives should be withheld because all three initiatives have a common primary purpose.

After the Secretary announced his decision to withhold the initiatives from the ballot, McNally applied for leave to commence an original action in this court for a writ of mandamus requiring the Secretary to place the initiatives on the ballot. We granted leave, and based on McNally's verified petition for writ of mandamus, we issued an alternative writ of mandamus requiring the Secretary to place the initiatives on the ballot or show cause why they should not be placed on the ballot. We expedited the proceeding and set a briefing schedule and date for oral argument.

During the pendency of this case, several parties intervened. Loveless and the Zohners intervened and essentially aligned with the Secretary. Nebraska Horsemen's Benevolent & Protective Association, Inc.; Ho-Chunk, Inc.; and Omaha Exposition and Racing, Inc., intervened and essentially aligned with McNally. We have considered the arguments and claims of all parties, and within our disposition with respect to issues identified as raised by McNally and the Secretary, we have also considered arguments of all intervenors. Our disposition disposes of all claims asserted before us.

We exercise original jurisdiction under Neb. Const. art. V, § 2, because this is a cause of action relating to revenue, in which the State has a direct interest, and because McNally has requested a writ of mandamus. See *State ex rel. Loontjer v. Gale*, 288 Neb. 973, 853 N.W.2d 494 (2014).

As we explain, we conclude that none of the initiatives is legally insufficient and that all three should be placed on the ballot. By separate order, the alternative writ is vacated; a writ of mandamus is issued by separate order ordering the Secretary to place all three initiatives on the ballot.

## STATEMENT OF FACTS

*Three Initiatives.*

In the verified petition for writ of mandamus, McNally alleges that the sponsors of the three initiatives at issue in this

case are Keep the Money in Nebraska, Nebraska Horsemen's Benevolent & Protective Association, Ho-Chunk, and Omaha Exposition and Racing. McNally alleges that Keep the Money in Nebraska is a registered ballot question committee and that M. Lynne McNally is a resident of Lancaster County, Nebraska, who is a member of Keep the Money in Nebraska and the executive vice president of Nebraska Horsemen's Benevolent & Protective Association. McNally alleges that on April 10, 2019, the sponsors filed with the Secretary the text of the three proposed ballot initiatives, along with the required object statements and sworn statements of sponsors, and that on July 3, 2020, the sponsors submitted sufficient and valid signatures for the petitions. McNally further alleges that in late July 2020, the Nebraska Attorney General sent the Secretary letters setting forth the ballot title and explanatory statement for each of the initiatives.

The first initiative, hereinafter referred to as "the Constitutional Initiative," included the following object statement: "The object of this petition amends the Nebraska Constitution to state that laws may be enacted allowing for the licensing, authorization, taxation, and regulation of all forms of games of chance to be conducted by authorized gaming operators within licensed racetrack enclosures in the state." The text of the Constitutional Initiative was set forth as proposing that Neb. Const. art. III, § 24, be amended to add a subsection (5), which would provide:

This section shall not apply to any law which is enacted contemporaneously with the adoption of this subsection or at any time thereafter and which provides for the licensing, authorization, regulation, or taxation of all forms of games of chance when such games of chance are conducted by authorized gaming operators within a licensed racetrack enclosure.

The second initiative, hereinafter referred to as "the Regulatory Initiative," included the following object statement: "The object of this petition enacts a statute allowing all games of chance to be conducted by authorized gaming

operators within licensed racetrack enclosures in Nebraska and establishes a Nebraska Gaming Commission to regulate such gaming in Nebraska." The text of the Regulatory Initiative was set forth as proposing the enactment of "the Nebraska Racetrack Gaming Act," which included enactment of various statutory provisions to, inter alia, permit operation of games of chance by authorized gaming operators within licensed racetrack enclosures, define terms used within the proposed act, set forth regulations regarding operation of such games, create the "Nebraska Gaming Commission," and set forth authority and duties of such commission. The text of the initiative also proposed to amend various existing statutes to include references to "games of chance," "the Nebraska Racetrack Gaming Act," "the Nebraska Gaming Commission," and other language relevant to regulation of games of chance. Of particular note in this original action, the initiative proposed to amend existing Neb. Rev. Stat. § 77-2704.20 (Reissue 2018), which currently provides: "Sales and use taxes shall not be imposed on the gross receipts from the sale, lease, or rental of and the storage, use, or other consumption in this state of purchases made by licensees of the State Racing Commission." The Regulatory Initiative proposed to amend § 77-2704.20 by adding "or of purchases made by licensees of the Nebraska Gaming Commission." The Regulatory Initiative also proposed to revise Neb. Rev. Stat. § 77-3001 (Supp. 2019), which defines the term "mechanical amusement device" for purposes of the Mechanical Amusement Device Tax Act and which includes a list of devices that are excluded from the definition. The Regulatory Initiative proposed to amend § 77-3001 to include in the list of exclusions, and therefore exclude from the definition, "gaming devices or limited gaming devices as defined in and operated pursuant to the Nebraska Racetrack Gaming Act."

The third initiative, hereinafter referred to as "the Tax Initiative," included the following object statement: "The object of this petition enacts a statute establishing an annual tax on gross gaming revenue generated by authorized gaming

operators of games of chance within licensed racetrack enclosures and directs the collection, enforcement, and distribution of revenue from such gaming tax." The text of the Tax Initiative was set forth as proposing statutory language to, among other things, impose an annual gaming tax; define statutory terms; set the tax at 20 percent of gross gaming revenue; authorize the Nebraska Gaming Commission to collect, account for, and remit the tax; and provide that specific percentages of the tax imposed be remitted to the Compulsive Gamblers Assistance Fund, the State's General Fund, the Property Tax Credit Cash Fund, and the county and/or the city or village in which the licensed racetrack enclosure is located. Of particular note to this original action, the Tax Initiative provided that 70 percent of the tax imposed was to be credited to the Property Tax Credit Cash Fund.

*Secretary of State.*

As indicated above, on August 7, 2020, the Secretary received separate letters from the objectors asking that the three initiatives be withheld from the ballot due to claimed legal insufficiency. After requesting and receiving additional letters from the objectors and from McNally and the other sponsors, the Secretary issued a letter dated August 25, 2020, in which he determined that the three initiatives should be withheld from the ballot, generally for the reason that the initiatives violated the single subject rule set forth in Neb. Const. art. III, § 2.

The Secretary set forth the reasoning for his decision in the letter. He began the analysis by determining that "the primary purpose for each [of the three initiatives] is the same: to permit previously prohibited games of chance to be conducted in the State of Nebraska." He further stated that "without the Constitutional Initiative, neither the Regulatory Initiative nor the Tax Initiative serves any purpose." But, he stated, even if there were separate primary purposes for each of the initiatives, the outcome would be the same. The Secretary then set forth law relating to the single subject rule. He stated that

in prior cases involving a single initiative, the question was whether the single initiative contained more than a single subject. But he noted that this case presented "a novel situation that has not been present in any case heretofore decided by the Supreme Court," namely, a situation in which "a single general subject constitutes the primary purpose of all three of the initiatives." The Secretary then reviewed each of the initiatives individually.

Regarding the Constitutional Initiative, the Secretary rejected certain arguments advanced by the objectors, but the Secretary found merit to an alternate argument advanced by the objectors regarding the Constitutional Initiative: that it contained a "'hidden authorization'" of certain types of gambling on tribal lands in Nebraska. The Secretary agreed with the objectors' reasoning that under the federal Indian Gaming Regulatory Act, permitting gaming activities by any organization in the State would require the State to negotiate with tribes to allow that type of gambling activity on tribal lands. The Secretary reasoned that the Constitutional Initiative would "likely . . . mislead voters into thinking that they are voting for an initiative that would prohibit the conduct of games of chance anywhere but at racetracks" but that instead, if the initiative were adopted, "gambling would not be limited to racetracks." The Secretary determined that if the initiative were adopted, the legal implications under the Indian Gaming Regulatory Act were not merely speculative, and he noted that there were three tribal casinos in the State that could engage in additional types of gaming and that one of the sponsors of the initiatives was "affiliated with a tribal . . . casino in Iowa within a few miles of the Nebraska border that is not operating within a racetrack." The Secretary found that the Constitutional Initiative creates the appearance that games of chance could be conducted only in racetrack enclosures. However, referring to *State ex rel. Loontjer v. Gale*, 288 Neb. 973, 853 N.W.2d 494 (2014), the Secretary reasoned that given the implications under the Indian Gaming Regulatory Act, the Constitutional Initiative was "likely to confuse voters," "likely

to materially mislead voters," and "create[] doubt about what action would be authorized."

The Secretary concluded that the Constitutional Initiative "effectively puts forth dual proposals: (1) authorizing expanded gambling at tribal casinos and (2) authorizing expanded gambling at racetracks by authorized operators." The Secretary stated that the first purpose was "hidden from the voters and impossible to ascertain from the text of the proposal." He concluded that the Constitutional Initiative violated the single subject rule by "[p]utting forth dual propositions in a single proposal" and "not permit[ting] voters to express a clear preference on dual propositions." Referring to the first proposal, the Secretary concluded that the Constitutional Initiative was "legally insufficient and for that reason [he would] withhold it from the ballot."

Although the Secretary rested his decision regarding the Constitutional Initiative on the reasoning set forth above, he noted an additional argument by the objectors that the initiative violated the single subject rule because it had "two subjects, which are, first, permitting the conduct of games of chance by authorized operators, and second, that such activity is permitted only at racetracks." The Secretary stated that this was a "strong argument" and that limiting gambling to racetracks was "not a benign purpose" but was "misleading." However, the Secretary did not explicitly reject or accept this argument as a basis for his decision to withhold the Constitutional Initiative from the ballot.

Regarding the Regulatory Initiative, the Secretary noted that the opponents argued that the initiative violated the single subject rule by including multiple purposes, including authorizing games of chance at racetracks, creating a gaming commission, imposing a license fee, providing tax breaks to operators, and decriminalizing gaming activities. The Secretary reviewed precedent regarding initiatives setting forth a regulatory scheme and reviewed each of the parts of the Regulatory Initiative based on such precedent. As to most of the parts of the Regulatory Initiative, the Secretary determined that "[t]he

regulatory requirements set forth in the Regulatory Initiative have a natural and necessary connection to the general subject" of permitting previously prohibited games of chance. The Secretary specifically addressed the imposition of the $1 million licensing fee and determined it had a natural and necessary connection.

The Secretary, however, also reviewed portions of the initiative that provided "[t]ax breaks . . . which exempt purchases by licensees of the gaming commission from sales and use taxes and the mechanical amusement device tax." The Secretary stated it was a "close question" whether such tax exemptions constituted a separate subject from the regulatory measures in the initiative. But the Secretary concluded that the "tax breaks [did] not have a natural and necessary connection to" a primary purpose of regulating gambling. The Secretary also noted that the tax exemptions were "not mentioned in the object statement" and that the sales and use tax exemption was "incorrectly stated in the introduction to the bill" as applying to the gaming commission rather than to licensees of the gaming commission. The Secretary stated that the descriptions were "misleading." The Secretary further noted that the Tax Initiative provided for taxation of newly expanded gaming activities. He reasoned that "dividing the tax proposals between two initiatives, and by failing to disclose the tax breaks contained in the Regulatory Initiative," the Regulatory Initiative created a condition confusing to voters and creating doubt as to the effect of the initiatives. The Secretary therefore concluded that the Regulatory Initiative was "not legally sufficient."

The Secretary then stated that there was "an additional, separate basis for the legal insufficiency" of the Regulatory Initiative. He reasoned that because he had determined that the Constitutional Initiative must be withheld from the ballot, the Regulatory Initiative, which shared a primary purpose with the Constitutional Initiative and which had a natural and necessary connection to that primary purpose, would have "no purpose at all." The Secretary concluded that if the Constitutional

Initiative were not on the ballot, adoption of the Regulatory Initiative "would be an idle act."

Regarding the Tax Initiative, the Secretary noted that the objectors argued that it violated the single subject rule because it had two distinct and independent proposals: (1) to raise revenue by imposing an annual gaming tax and (2) to "distribute the bulk of the tax revenue for property tax relief." The Secretary noted that the objectors indicated that other distributions of tax revenue "had a natural and necessary connection with the tax proposed, but that property tax relief is a separate topic included only to entice voters to vote in favor of the gaming tax."

In reaction, the Secretary noted precedent in which this court determined that provisions for property tax relief included in other initiatives violated the single subject rule. The Secretary reasoned that "[w]ere the contents of the Tax Initiative contained in the Constitutional Initiative, the initiative would be legally insufficient and would be withheld from the ballot as logrolling." The Secretary stated that the sponsors of the initiatives "attempt[ed] to avoid the prohibition against logrolling by setting forth the logrolling provisions in one of the Initiatives but not the others."

The Secretary rejected McNally's argument that "the property tax enticement" was proper because it was "contained in a separate initiative from that which expands gambling." The Secretary instead reasoned that the primary purpose of all three initiatives was the same and that the provisions of the Tax Initiative, other than the property tax feature, had a natural and necessary connection to the extension of gambling. The Secretary reasoned that property tax relief had no natural and necessary connection to the expansion of gambling. The Secretary reasoned that whether the Tax Initiative had the same primary purpose as the other initiatives, or whether its primary purpose was taxation of gambling revenues, "the property tax relief provisions contained in the Tax Initiative constitute logrolling and violate the single subject rule." Similar to his reasoning with regard to the Regulatory

Initiative, the Secretary reasoned that taxation provisions are "confusingly split between the Regulatory Initiative and the Tax Initiative." The Secretary concluded that the Tax Initiative was legally insufficient.

Also similar to his reasoning with regard to the Regulatory Initiative, the Secretary concluded that there was an additional separate basis for the legal insufficiency of the Tax Initiative. He reasoned that because he had decided the Constitutional Initiative must be withheld, that without the Constitutional Initiative, adoption of the Tax Initiative "would be an idle act."

The Secretary finally noted that the opponents raised certain constitutional challenges to the initiatives. However, the Secretary determined that it was not clear whether such challenges were "within the purview of a legal sufficiency review by the Secretary of State" and that the issues did not appear to be ripe for decision. He therefore expressed no opinion on those objections.

The Secretary stated in conclusion that "[p]art of the protection of the right of initiative is to assure that such petitions are neither misleading nor manipulative." He concluded that based on his review and the reasons set forth in his letter, he would withhold all three initiatives from the ballot "unless otherwise ordered by a court of competent jurisdiction."

*Original Action for Writ of Mandamus.*

After the Secretary withheld the three initiatives from the ballot, McNally filed this original action for writ of mandamus. We accepted jurisdiction and issued an alternative writ of mandamus requiring the Secretary to place the three initiatives on the ballot or show cause why they should not be placed on the ballot. We set schedules for briefing and oral argument. Several parties identified previously in the opinion intervened.

*Summary of Issues Presented in This Action.*

In response to our alternative writ of mandamus, the Secretary asserts that the issues presented in this original action are whether he correctly concluded that (1) the Constitutional

Initiative violates the single subject rule; (2) because the Constitutional Initiative must be withheld from the ballot, the Regulatory Initiative and the Tax Initiative must also be withheld from the ballot because they will have no effect without the Constitutional Initiative; (3) the Regulatory Initiative violates the single subject rule; and (4) the Tax Initiative violates the single subject rule.

McNally asserts that the Secretary incorrectly (1) applied the single subject rule by considering all three initiatives together, even though voters will vote on each separately; (2) determined that the Constitutional Initiative violates the single subject rule; (3) determined that the Regulatory Initiative violates the single subject rule; (4) determined that the Tax Initiative violates the single subject rule; and (5) determined that adoption of the Regulatory Initiative and the Tax Initiative without the simultaneous adoption of the Constitutional Initiative would be an "idle act."

We note that the Secretary does not appear to dispute that the initiative petitions garnered sufficient signatures, nor does he appear to dispute the validity of the initiatives with respect to any other issue such as verification or submission by a specific date. We therefore presume such requirements were met and would not prevent placement of the initiatives on the ballot.

## ANALYSIS

As set forth above, we issued an alternative writ of mandamus requiring the Secretary to place the three initiatives on the ballot or show cause why a peremptory writ requiring such action should not issue. The Secretary has responded to our alternative writ, and therefore, we must determine whether the Secretary has shown cause why we should not issue a peremptory writ requiring him to place any or all of the initiatives on the ballot.

The Secretary contends that all three initiatives should not be placed on the ballot. In his response to the alternative writ, the Secretary argues that the Constitutional Initiative violates the single subject rule because it has two subjects: (1) authorizing

games of chance and (2) limiting such activity to licensed racetrack enclosures. As an alternative second argument, the Secretary maintains that the Constitutional Initiative has the hidden purpose of authorizing games of chance on tribal lands. The Secretary argues that because the Constitutional Initiative must be withheld from the ballot, the Regulatory Initiative and the Tax Initiative must also be withheld from the ballot for the reason that they could not stand on their own because they would directly conflict with the current constitutional provision generally prohibiting games of chance.

The Secretary alternatively argues that if we determine the Regulatory Initiative and the Tax Initiative need not be withheld for this reason, each initiative in itself violates the single subject rule. The Secretary argues that the Regulatory Initiative, like the Constitutional Initiative, violates the single subject rule because it both authorizes games of chance and limits their operation to licensed racetrack enclosures. The Secretary also argues that the Regulatory Initiative violates the single subject rule because it includes provisions that would exempt licensees from sales and use tax and that would exempt authorized gaming devices from the Mechanical Amusement Device Tax Act; he argues that these tax-related topics do not have a natural and necessary connection to regulation of games of chance.

In considering the Tax Initiative, the Secretary maintains that because the sponsors have inextricably bound the Tax Initiative and the Regulatory Initiative together by including taxation issues in both, the propriety of putting the Tax Initiative on the ballot is entirely dependent on the placement of the Regulatory Initiative. The Secretary argues that because the Tax Initiative must be analyzed with the Regulatory Initiative, the Tax Initiative presents a problem of "logrolling" because voters who want to vote for the Tax Initiative in order to provide property tax relief would be forced to also vote for the Regulatory Initiative, which authorizes the activity to be taxed to provide funds for such property tax relief.

In response, McNally generally argues that the single subject rule provides that voters must be allowed to cast separate votes on separate subjects and that because voters could vote for or against each separate initiative, the legal sufficiency of each initiative must be evaluated separately without reference to the other initiatives. McNally argues that if any initiative is legally sufficient in itself, it must be placed on the ballot whether or not either or both of the other ballot issues are legally sufficient. McNally argues that, viewed individually, none of the three initiatives violates the single subject rule and that therefore, each of the three initiatives must be placed on the ballot.

*Summary of Legal Determinations.*

Immediately below, we set forth standards related to the single subject rule. As set forth below, we determine that each initiative must be analyzed individually for its legal sufficiency, and we thereafter analyze each initiative separately. Based on such analysis, we conclude that neither the Constitutional Initiative, nor the Regulatory Initiative, nor the Tax Initiative violates the single subject rule. We therefore conclude that the Secretary has not shown cause why we should not issue a peremptory writ requiring him to place the Constitutional Initiative, the Regulatory Initiative, and the Tax Initiative on the ballot.

*Our Precedent Generally Sets Forth a Natural and
Necessary Connection Test for the Single Subject
Rule Found in Neb. Const. art. III, § 2.*

[1,2] The people have the power to amend the Nebraska Constitution and enact statutes by the initiative process pursuant to Neb. Const. art. III, § 2, which provides in part: "The first power reserved by the people is the initiative whereby laws may be enacted and constitutional amendments adopted by the people independently of the Legislature." We have repeatedly said that the right of initiative is precious to the people and one which the courts are zealous to preserve to the

fullest tenable measure of spirit as well as letter. *Christensen v. Gale*, 301 Neb. 19, 917 N.W.2d 145 (2018); *Hargesheimer v. Gale*, 294 Neb. 123, 881 N.W.2d 589 (2016); *Stewart v. Advanced Gaming Tech.*, 272 Neb. 471, 723 N.W.2d 65 (2006); *State ex rel. Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006); *Loontjer v. Robinson*, 266 Neb. 902, 670 N.W.2d 301 (2003); *State ex rel. Stenberg v. Moore*, 258 Neb. 199, 602 N.W.2d 465 (1999). The power of initiative must be liberally construed to promote the democratic process, and provisions authorizing the initiative should be construed in such a manner that the legislative power reserved in the people is effectual. *Stewart v. Advanced Gaming Tech., supra*.

[3-6] A constitution represents the supreme written will of the people regarding the framework for their government. *State ex rel. Johnson v. Gale*, 273 Neb. 889, 734 N.W.2d 290 (2007). The people of Nebraska may amend their Constitution in any way they see fit, provided the amendments do not violate the federal Constitution or conflict with federal statutes or treaties. *State ex rel. Johnson v. Gale, supra*. This court makes no attempt to judge the wisdom or the desirability of enacting initiative amendments. *Id*. We agree with the statement elsewhere that

> the interests that propel both proponents and opponents of initiative petitions may often involve self-interest rather than the public interest. But our focus in deciding whether an initiative petition reaches the voters must be on the actual law proposed by the petition, not on the motives that may lie behind it; the voters may consider those motives in deciding how they vote on the petition.

*Bogertman v. Attorney General*, 474 Mass. 607, 618-19, 53 N.E.3d 627, 636 (2016).

[7] Among other matters related to initiatives, Neb. Const. art. III, § 2, provides that "[i]nitiative measures shall contain only one subject." We have stated that a purpose of this language is to avoid logrolling, which is the practice of combining dissimilar propositions into one proposed amendment so

that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately. *Christensen v. Gale, supra*.

[8,9] Like the majority of jurisdictions, we follow the natural and necessary connection test which we have set forth as follows: Where the limits of a proposed law, having natural and necessary connection with each other, and, together, are a part of one general subject, the proposal is a single and not a dual proposition. *Id.* The controlling consideration in determining the singleness of a subject for purposes of article III, § 2, of the Nebraska Constitution is its singleness of purpose and relationship of the details to the general subject, not the strict necessity of any given detail to carry out the general subject. *Christensen v. Gale, supra*. The general subject is defined by its primary purpose. *Id*. Here, because the parts of the proposed Constitutional Initiative all relate to the same general subject, the expanding of games of chance, the Constitutional Initiative does not violate the single subject rule nor logrolling.

We note that this case appears to present an issue of first impression regarding application of the single subject rule when separate but related initiatives are reviewed for legal sufficiency. The Secretary argues in this case that because the three initiatives share a common primary purpose, they must be considered with one another when determining whether any or all of the initiatives violate the single subject rule. McNally disputes that the three initiatives have the same primary purpose, but argues that, in any event, each initiative must be analyzed individually to determine whether it violates the single subject rule. The parties appear to agree that our precedent does not address that issue.

[10] As noted above, a purpose of the single subject rule is to avoid forcing voters to vote for or against the whole package even though they would have voted differently had the propositions been submitted separately. When initiatives are presented separately, even if on the same ballot, a voter has the option to vote for one initiative but not the other, even if the initiatives have some connection to one another. Because

voters can vote differently on each separate initiative, we conclude and hold that single subject review should focus on the specific initiative being reviewed without reference to the content of another initiative that is submitted separately.

Finally, we note that the Secretary's arguments rely in large part on language in an opinion in which we stated:

"a proposed municipal ballot measure is invalid if it would (1) compel voters to vote for or against distinct propositions in a single vote—when they might not do so if presented separately; (2) confuse voters on the issues they are asked to decide; or (3) create doubt as to what action they have authorized after the election."

*State ex rel. Loontjer v. Gale*, 288 Neb. 973, 1000, 853 N.W.2d 494, 513 (2014) (quoting *City of North Platte v. Tilgner*, 282 Neb. 328, 803 N.W.2d 469 (2011)). The Secretary's arguments focus in large part on asserting that the initiatives in this case are misleading and that they would "confuse voters" and "create doubt." We take this opportunity to clarify the quoted language in *State ex rel. Loontjer v. Gale, supra*.

As is clear from the language quoted above, we were quoting *City of North Platte v. Tilgner, supra*, which set forth standards related to municipal ballot measures and the common-law rules that have been applied to such standards. In *State ex rel. Loontjer v. Gale, supra*, we were considering constitutional amendments proposed by the Legislature and the separate vote requirement of Neb. Const. art. XVI, § 1, which governs constitutional amendments proposed by the Legislature. We referred to *Tilgner*, which described a natural and necessary test for the single vote requirement set forth in subsection (1) of the quoted language regarding municipal ballot measures. We concluded that the natural and necessary test for the single vote requirement for municipal ballot measures should also be used in connection with the separate vote provisions of Neb. Const. art. XVI, § 1, governing constitutional amendments proposed by the Legislature.

In *State ex rel. Loontjer v. Gale, supra*, we recognized that among the reasons for a single subject rule is that including

multiple subjects could confuse voters and create doubt, but we have not said that confusion or doubt are separate requirements for a legally insufficient measure or that they are required elements of the test to determine whether a measure violates the single subject requirement. As we noted above, in *Christensen v. Gale*, 391 Neb. 19, 917 N.W.2d 145 (2018), we said that the natural and necessary test described in *State ex rel. Loontjer v. Gale, supra*, for the separate vote requirement under Neb. Const. art. XVI, § 1, for constitutional amendments proposed by the Legislature is also an applicable framework to consideration of the single subject rule for initiatives brought under Neb. Const. art. III, § 2. Therefore, the natural and necessary test governs our single subject analysis in this case.

We apply the foregoing principles regarding the single subject rule to review the Secretary's arguments regarding each of the three initiatives at issue in this case and to determine whether or not each initiative violates the single subject rule and is therefore legally insufficient.

*Constitutional Initiative Does Not*
*Violate Single Subject Rule.*

In his response to the alternative writ, the Secretary argues that the Constitutional Initiative violates the single subject rule in two different ways, because (1) it both authorizes games of chance and limits them to racetrack enclosures and (2) in addition to authorizing games of chance at racetrack enclosures, it authorizes games of chance on tribal lands. Because we conclude that there is no violation of the single subject rule, we reject the Secretary's arguments and conclude that the Secretary has not shown cause why the Constitutional Initiative should not be placed on the ballot.

In reviewing the Secretary's arguments regarding the Constitutional Initiative, we note that a review for legal sufficiency should focus on the actual text of the initiative. We therefore repeat the text of the Constitutional Initiative at this point. The initiative proposes to amend the existing Neb. Const. art. III, § 24, by adding another exception to the

prohibition against gambling by providing the following new subsection (5):

> This section shall not apply to any law which is enacted contemporaneously with the adoption of this subsection or at any time thereafter and which provides for the licensing, authorization, regulation, or taxation of all forms of games of chance when such games of chance are conducted by authorized gaming operators within a licensed racetrack enclosure.

That is the entirety of the amendment proposed by the Constitutional Initiative.

The text of the amendment refers to games of chance within a licensed racetrack enclosure. The dissent is concerned that the racetrack where games of chance are located would serve as host and could profit therefrom. Regarding profit, we note that other subsections in art. III, § 24, such as subsection 2, limit the scope to charitable and community betterment; this Constitutional Initiative does not. We limit our analysis to the text of the Constitutional Initiative, which simply specifies the place of games of chance.

We first address the Secretary's assertion that the Constitutional Initiative contains two subjects. With respect to the first manner of alleged violation, Neb. Const. art. III, § 2, the Secretary asserts the Constitutional Initiative contains two subjects: (1) authorizing all forms of games of chance and (2) restricting those new forms of gambling to racetracks. The Secretary generally argues that authorizing games of chance is the primary purpose and that restricting games of chance to racetrack enclosures does not have a natural and necessary connection to authorizing games of chance. We find the Secretary's reading of the one sentence proposed to be added to the Constitution to be an inaccurate application of the single subject rule.

By reviewing the proposed amendment in context, we believe the Secretary's characterization of the initiative as having two subjects is inaccurate. Article III, § 24, of the Nebraska Constitution, which the Constitutional Initiative

proposes to amend, begins: "[*e*]*xcept as provided in this section*, the Legislature shall not authorize any game of chance or any lottery . . . ." (Emphasis supplied.) This is an invitation to authorize expanded gambling by way of exceptions and, indeed, that has occurred. Both the people (through initiative) and the Legislature (by authorization) have accepted the invitation in art. III, § 24(1), to expand gambling. See art. III, § 24(2) through (4). Art. III, § 24, has been amended to include exceptions which permit, inter alia, wagering on horses at racetracks and, separately, lotteries. The proposed Constitutional Initiative exception accepts the constitutional offer to expand gambling and would permit games of chance at racetracks.

By definition, an exception to art. III, § 24, is an expansion of gambling. When gambling is expanded, it naturally follows that the enlarged activity shall occur somewhere, hence the description "within a licensed racetrack enclosure." See *Bogertman v. Attorney General*, 474 Mass. 607, 53 N.E.3d 627 (2016) (discussing location in the context of expanded gambling). Gambling, i.e., wagering on horses, is already located "within a licensed racetrack enclosure." Art. III, § 24(4)(a). We do not read the Constitutional Initiative to prevent games of chance being located at additional places by later amendments.

In the present case, the sponsors of the Constitutional Initiative concluded that the new gambling exception activity—which art. III, § 24(1), invites—should occur at racetracks where other gambling already occurs as a result of a previous exception. The Constitutional Initiative asks voters if they want games of chance to be permitted within racetrack enclosures. Voters who want games of chance nearby or elsewhere can vote against it.

Identifying and limiting the location of a new activity is a detail naturally and necessarily connected to its creation and not a separate subject. *Christensen v. Gale, supra*. Voters naturally want to know the locale of expanded gambling. We have said that provisions in a proposal must be closely related to be presented to the electorate for a single vote. *State ex rel.*

*Loontjer v. Gale*, 288 Neb. 973, 853 N.W.2d 494 (2014). The Constitutional Initiative meets these tests.

The Secretary argues that logrolling is occurring because there may be voters who might support authorization of new games of chance but who dislike the "favored treatment" given to racetracks and would be forced to vote for the racetrack limitation in order to authorize new games of chance. We do not read the proposal as vulnerable to the claim of logrolling. In *State ex rel. Loontjer v. Gale*, 288 Neb. at 995, 853 N.W.2d at 510, we said that

> logrolling is the practice of combining dissimilar propositions into one proposed amendment so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately. It is sometimes described as including favored but unrelated propositions in a proposed amendment to ensure passage of a provision that might otherwise fail.

The premise of these descriptions of logrolling is that the two propositions are unrelated. Logrolling has no application when propositions are related.

Under the Constitutional Initiative, each voter gets to decide whether authorization of games of chance is a sufficiently important goal that he or she will support the incremental expansion provided by this initiative. If so, he or she could vote for it. Or he or she could decide that the racetrack limitation is an unfavorable feature and therefore he or she could vote against it. When the parts have a natural and necessary connection, there is no logrolling. When an unattractive feature is paired with an attractive feature and they do not have a natural and necessary connection to one another, then logrolling is a problem. No logrolling occurs here.

We have observed that the provisions authorizing the initiative should be construed in such a manner that the legislative power reserved in the people is effectual. *State ex rel. Loontjer v. Gale, supra*; *State ex rel. Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006). Elsewhere, discussing the single subject

rule, it has been cautioned that "defining the constitutionally-valid topic too broadly would render the safeguards of [a single subject rule] inert. Conversely, the requirements of [a single subject rule] must not become a license for the judiciary to 'exercise a pedantic tyranny'" over efforts to change the law. *PA Against Gambling Expansion Fund v. Com.*, 583 Pa. 275, 296, 877 A.2d 383, 395-96 (2005).

We have stated that the power of initiative must be liberally construed to promote the democratic process. *State ex rel. Loontjer v. Gale, supra*; *State ex rel. Lemon v. Gale, supra*. Whether or not games of chance conducted at racetracks should become the law is for the people to decide.

We next consider the Secretary's argument that the Constitutional Initiative violates the single subject rule because in addition to authorizing games of chance at racetrack enclosures, it also authorizes games of chance on tribal lands. We reject this argument. As we stated above, a legal sufficiency review should focus on the actual text of the proposed initiative. The Secretary's argument rests on the notion that there is a "hidden" subject in the Constitutional Initiative that simply is not present in the text of the proposal. That is, the Secretary concludes that the initiative violates the single subject rule because it contains this second hidden subject.

When reviewing legal sufficiency, we do not speculate on the hidden motives or self-interest of the sponsors. By that same token, we do not speculate on the potential motives or self-interest of those who object to placing the initiative on the ballot. To the extent the proposed initiative might have repercussions that are not apparent from the text of the initiative, whether such repercussions are unintended consequences or ulterior motives, is an argument that should be made to the voters rather than to the Secretary or to a court conducting a legal sufficiency review. See *Hargesheimer v. Gale*, 294 Neb. 123, 881 N.W.2d 589 (2016) (noting that referendum statutes provide for disclosure of sponsors and financial contributors so that voters can know who is backing the proposal and based on

that information make their own decisions whether the motives of the backers will affect their vote).

We need not delve into federal or tribal law in order to determine whether the amendment proposed by the Constitutional Initiative could have the effect on gaming in tribal casinos that the Secretary asserts. Such analysis is beyond the scope of preelection single subject review. It is not a subject set forth by the text of the initiative. To the extent the repercussions are as the Secretary asserts, that is a matter for opponents to present to voters who may decide the likelihood and desirability of such repercussions. Having rejected the arguments of the Secretary and also those of intervenors, we conclude that the Secretary has not shown cause why the Constitutional Initiative should not be placed on the ballot. We therefore will issue a peremptory writ of mandamus requiring the Secretary to place the Constitutional Initiative on the ballot.

*Regulatory Initiative Does Not*
*Violate Single Subject Rule.*

The Secretary argues that the Regulatory Initiative violates the single subject rule for the same reason that the Constitutional Initiative does and for the additional reason that provisions addressing taxation have no natural and necessary connection to the regulatory scheme set forth in the initiative. We conclude that the Regulatory Initiative does not violate the single subject rule and that the Secretary has not shown cause why the Regulatory Initiative should not be placed on the ballot.

Below we consider various provisions of the Regulatory Initiative, but we initially quote section 4(2). Section 4(2) provides:

> No more than one authorized gaming operator license shall be granted for each licensed racetrack enclosure within the state; provided that, it shall not be a requirement that the person or entity applying for or be granted such authorized gaming operator license hold a racing license or be the same person or entity who operates the

licensed racetrack enclosure at which such authorized gaming operator license shall be granted.

This language in the Regulatory Initiative indicates that although games of chance are to be located within a racetrack enclosure, the entity who operates such enclosure will not necessarily be the operator of games of chance.

The Secretary first argues that the Regulatory Initiative violates the single subject rule for the same reason he asserted in connection with the Constitutional Initiative, that is, it violates the single subject rule—because it both (1) authorizes games of chance and (2) limits operation of such games of chance to racetrack enclosures. However, the Regulatory Initiative does not in itself "authorize games of chance." Instead, it states in part that "to the full extent permitted by the Constitution of Nebraska, including amendments to the Constitution of Nebraska adopted contemporaneously . . . , the operation of games of chance is permitted only by authorized gaming operators within licensed racetrack enclosures." The Regulatory Initiative does not itself authorize games of chance and instead it recognizes that such authorization comes from the constitution and that the operation of the regulatory scheme it sets forth is effective only to the extent it is authorized by the constitution.

The subject of the Regulatory Initiative is a regulatory scheme for operation of games of chance that may at some time be authorized by the constitution, and among the features of that regulatory scheme is limiting operation of such games to racetrack enclosures. Because authorization of games of chance is not a subject of the Regulatory Initiative, the limitation to racetracks is not a second subject and instead is to be considered as one of the components of the regulatory scheme.

The Secretary does not argue, and we do not find, that the limitation to racetrack enclosures does not have a natural and necessary connection to regulation of games of chance. The Regulatory Initiative includes various other provisions related to regulation of games of chance, and in other cases, we have found that an initiative that purports to regulate a

specific subject may include diverse components related to that single subject.

We recently made this observation in *Christensen v. Gale*, 301 Neb. 19, 33, 917 N.W.2d 145, 157 (2018), where we said:

> [I]n *City of Fremont v. Kotas*, [279 Neb. 720, 781 N.W.2d 456 (2010), *abrogated on other grounds, City of North Platte v. Tilgner*, 282 Neb. 328, 803 N.W.2d 469 (2011),] we held that an initiative petition did not violate the single subject rule. Despite several components of the proposed measure dealing with the subjects of occupancy, licensing, electronic verification, government uses, resources, and penalties, and the application to both landlords and employers, we held that these subjects had a natural and necessary connection with each other and were part of the general subject of regulating illegal immigration.

In his letter, the Secretary rejected the objectors' arguments that certain of the components of the Regulatory Initiative were not related to regulation of games of chance, and he does not assert in his response to our alternative writ that those components or other components of the Regulatory Initiative, other than those discussed below, caused the initiative to violate the single subject rule.

The Secretary does argue that the Regulatory Initiative violates the single subject rule because it contains provisions which (1) exempt licensees of the Nebraska Gaming Commission from sales and use tax, and (2) exclude gaming devices from the Mechanical Amusement Device Tax Act. He argues that these "tax breaks" do not have a natural and necessary connection to regulation of games of chance and that the sponsors recognized that taxation issues are not related to regulation because they included other tax-related issues in the separate Tax Initiative.

We disagree. Both tax-related provisions within the Regulatory Initiative have a natural and necessary connection to the regulation of games of chance. Whether operators and licensees are subject to sales and use tax and whether gaming devices authorized in the regulatory scheme are subject to the

mechanical amusement device tax are both issues relevant to regulation of games of chance. In the Regulatory Initiative, the sales and use tax exemption for licensees of the gaming commission is accomplished by amending a statute that already exempts licensees of the racing commission to include licensees of the gaming commission. See § 77-2704.20. The exclusion of gaming devices from the Mechanical Amusement Device Tax Act is accomplished by adding "gaming devices" defined in the gaming act to a list of items that are not subject to the tax and that list already includes "pickle card dispensing devices." See § 77-3001. We think this indicates that these provisions are related to the regulation of games of chance in the same sense that the statutes proposed to be amended are part of the regulatory schemes for other forms of gambling—horseracing and pickle cards, respectively.

We also reject the argument that including these tax-related provisions in the Regulatory Initiative rather than the Tax Initiative implicates the single subject rule. The mere fact that the provisions might also have some connection to the general subject of taxation does not mean that they do not also have a natural and necessary connection to the regulation of games of chance. In fact, if these provisions were included in the Tax Initiative, it would be arguable that they have even less connection to the purpose of that initiative than they do the Regulatory Initiative. Whether licensees are exempted from sales and use tax and whether gaming devices are subject to the Mechanical Amusement Device Tax Act are issues that seem to have only tangential connection to a tax initiative whose purpose is to impose a tax on the revenue of games of chance and provide for allocation for the revenue. Furthermore, the fact that a provision may have some connection to another subject, such as "taxation," does not mean it does not have a natural and necessary connection to the subject of a specific initiative, such as "regulation." Our analysis is not whether the provisions could better have been included elsewhere; we only consider whether they have a natural and necessary connection

to the regulatory purpose of the initiative, and we conclude that they do.

We reject the Secretary's argument that the Regulatory Initiative violates the single subject rule, and we conclude that the Secretary has failed to show cause why the Regulatory Initiative should not be placed on the ballot. We will therefore issue a peremptory writ requiring the Secretary to include the Regulatory Initiative on the ballot.

*Tax Initiative Does Not Violate Single Subject Rule.*

The Secretary argues that the Tax Initiative violates the single subject rule. He generally argues that the Tax Initiative is "interwoven with—and entirely dependent on—the Regulatory Initiative." We reject this argument and conclude that the Secretary has not shown cause why the Tax Initiative should not be placed on the ballot.

The Secretary argues that the Tax Initiative and the Regulatory Initiative are so "tightly intertwined" that they must be considered together for single subject analysis. However, as we discussed above, the purpose of the single subject rule is to allow voters to vote separately on different subjects. Because the voters can vote individually and differently on each initiative presented, a single subject review focuses on the specific initiative at issue.

Viewed in that manner, as we discussed in connection with the Regulatory Initiative, the fact that the tax-related provisions of the Regulatory Initiative and the Tax Initiative both have a connection to the general subject of taxation does not mean that by necessity they must, or even can, be included in a single initiative. Single subject analysis focuses on the subjects and provisions actually included in an initiative and not on provisions that might have been included or that are included in a separate initiative. Therefore, the fact that some tax-related provisions are included in the Regulatory Initiative is not relevant to our review of the Tax Initiative.

The Tax Initiative imposes a tax on revenues from games of chance and sets forth how the tax collections will be distributed. The imposition of a tax and the distribution of that tax have an obvious natural and necessary connection to one another. If a voter is asked to approve a new tax, it is natural and necessary that the voter would want to know and control how the taxes so collected will be used. A voter is unlikely to support a tax if he or she does not know how the proceeds will be used. Therefore, viewing the Tax Initiative alone, it does not violate the single subject rule.

The Secretary argues that certain distributions provided in the Tax Initiative, particularly that 70 percent of the collected tax be distributed for property tax relief, constitute what single subject precedent has characterized as impermissible "logrolling." For example, in *State ex rel. Loontjer v. Gale*, 288 Neb. 973, 853 N.W.2d 494 (2014), we held that a proposed ballot measure violated the separate-vote provision of article XVI, § 1, of the Nebraska Constitution, which governs proposals by the Legislature to amend the Constitution and which *Christensen v. Gale*, 301 Neb. 19, 32, 917 N.W.2d 145, 156 (2018), concluded "imposes the same requirements as the single subject provision under article III, § 2." The measure at issue in *State ex rel. Loontjer* would have amended the Constitution by way of one proposal to permit slot-machine-type gambling on replayed horseraces and would direct tax revenue from that activity, as well as from live horseracing which was already allowed by the Constitution, to property tax relief and education funding. We determined in *State ex rel. Loontjer* that constitutional authorization of a new form of wagering lacked a natural and necessary connection to the measure's proposal to the use tax revenues for property tax relief and education and that the only purpose of including such property tax relief in the same measure "was to enhance the odds that voters would approve the new form of wagering," which effect we described as "logrolling." 288 Neb. at 1004, 853 N.W.2d at 515.

As noted above in this opinion, we have described logrolling as "the practice of combining dissimilar propositions into one proposed amendment so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately." *Christensen v. Gale*, 301 Neb. at 31, 917 N.W.2d at 156. The Secretary's logrolling argument requires that we look at all three initiatives, or at least both the Regulatory Initiative and the Tax Initiative, together and determine that inclusion of property tax relief in the Tax Initiative serves as an incentive for voters to approve the other initiatives in order to achieve such relief. We reject the Secretary's argument.

As described above, logrolling means a situation in which voters are required to vote for or against the whole package even though they would have voted differently had the propositions been submitted separately. This concern is not present when, as here, the initiatives are submitted separately and voters may vote on each individually and can choose to vote for all three or only for those of which they approve. For example, a voter might not want to authorize expanded gambling and therefore vote against authorization and/or regulation, but vote for the tax initiative on the thought that if games of chance are authorized by the general electorate, the voter wants those activities taxed and the proceeds used for, among other things, property tax relief. The voter is not forced to vote for authorization in order to achieve property tax relief unless the voter believes authorizing games of chance is an acceptable way to achieve property tax relief.

The distribution of a tax has an obvious natural and necessary connection to the imposition of that tax and therefore both features are part of a single subject. Clearly, a voter would be highly unlikely to vote for a tax unless he or she knew and supported the purpose to which tax proceeds would be directed. We do not believe that including an attractive disposition of proceeds of the tax authorized by the initiative which imposes the tax can be viewed as a ploy to trick a voter into voting for imposition of the tax.

We conclude that the Tax Initiative does not violate the single subject rule and that therefore, the Secretary has not shown cause why it should not be placed on the ballot. We will therefore issue a peremptory writ of mandamus requiring the Secretary to place the Tax Initiative on the ballot.

## CONCLUSION

The people have the power to amend the Nebraska Constitution and enact statutes by the initiative process pursuant to Neb. Const. art. III, § 2, which provides in part: "The first power reserved by the people is the initiative whereby laws may be enacted and constitutional amendments adopted by the people independently of the Legislature." We have repeatedly said that the right of initiative is precious to the people and one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter. We conclude that in response to our alternative writ, the Secretary has not shown cause why either the Constitutional Initiative, the Regulatory Initiative, or the Tax Initiative should not be placed on the ballot. We therefore vacate our alternative writ and by separate order issue a peremptory writ of mandamus ordering the Secretary to place the Constitutional Initiative, the Regulatory Initiative, and the Tax Initiative on the November 2020 ballot.

Writ of mandamus granted.

Funke, J., and Welch, Judge, join in this opinion.
Papik, J., not participating.

Cassel, J., concurring.

In the lead opinion, I join the sections entitled "Nature of Case," "Statement of Facts," and "Conclusion," and the judgment of the court.

The court's decision today is dictated by the seven words of article III, § 2, of the Nebraska Constitution stating, "Initiative measures shall contain only one subject." That same section of the state Constitution reserves the power of initiative to the people. While this court has stated that the

power of initiative must be liberally construed to promote the democratic process,[1] it has also recognized that a procedural requirement found in the same section of the state Constitution in which the people reserved to themselves the power of initiative serves to define the scope of the initiative power.[2] This court must give "meaningful effect" to the self-imposed limitation on that power.[3]

The words in a constitutional provision must be interpreted and understood in their most natural and obvious meaning unless the subject indicates or the text suggests that they are used in a technical sense.[4] It is also appropriate and helpful to consider the evil and mischief attempted to be remedied, the objects sought to be accomplished, and the scope of the remedy its terms imply.[5]

A purpose of these seven words is to avoid voter confusion and logrolling, which is the practice of combining dissimilar propositions into one proposed amendment so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately.[6] I believe all members of the court agree with this purpose.

Where the limits of a proposed law, having natural and necessary connection with each other, and, together, are a part of one general subject, the proposal is a single and not a dual proposition.[7] The controlling consideration in determining the singleness of a proposed amendment is its singleness of

---

[1] See *Stewart v. Advanced Gaming Tech.*, 272 Neb. 471, 723 N.W.2d 65 (2006).

[2] See *State ex rel. Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006).

[3] See *id.*

[4] *Id.*

[5] See *id.*

[6] *Christensen v. Gale*, 301 Neb. 19, 917 N.W.2d 145 (2018).

[7] *Id.*

purpose and the relationship of the details to the general subject.[8] The general subject is defined by its primary purpose.[9]

The proposed amendment to article III, § 24, of the Nebraska Constitution states in relevant part, "This section shall not apply to any law . . . which provides for . . . all forms of games of chance when such games of chance are conducted by authorized gaming operators within a licensed racetrack enclosure." Fundamentally, a majority of this court concludes that this language prescribes "what" (gaming) and "where" (racetracks), while our dissenting colleagues view the words as dictating "what" (gaming) and "who" (racetrack hosts). But I do not read "authorized gaming operators within a licensed racetrack enclosure" synonomously with either existing licensees or existing racetracks. Further, I do not read any of my dissenting colleagues to agree with the reasoning of the Secretary of State analyzing the Constitutional Initiative, the Regulatory Initiative, and the Tax Initiative as a single proposal. Nor do I view any member of this court as thinking it proper to consider, for purposes of article III, § 2, the effect of adoption of the initiative upon tribal gaming.

The primary purpose of the proposal is to provide another exception to the basic prohibition of games of chance, lotteries, and gift enterprises under article III, § 24(1). The detail of "where" is naturally and necessarily related to the "what." Expansion of gaming presumes some location. The racetrack limitation merely specifies the place. This dictates that the proposal contains only one "subject" within the meaning of article III, § 2.

That is all the Secretary of State was required to determine, and our scope goes no further. The arguments for and against the wisdom and desirability of the proposal are for the people of this state to decide. Because only one subject was

---

[8] *Id*.

[9] *Id*.

specified in the Constitutional Initiative, that proposal must go to the voters.

I join the reasoning of my colleagues in the lead opinion regarding application of the single subject rule to the Regulatory Initiative and the Tax Initiative.

Heavican, C.J., Stacy, and Freudenberg, JJ., dissenting.

To the extent the plurality concludes there is just one subject presented in the Constitutional Initiative, we respectfully disagree. Because we discern two separate subjects with separate purposes, we conclude the initiative violates the single subject requirement of Neb. Const. art. III, § 2. We would deny the writ and allow the Secretary of State to withhold the Constitutional Initiative from the November 2020 ballot.

A constitution represents the supreme written will of the people regarding the framework for their government, and the people may amend their Constitution in any way they see fit, provided the amendments do not violate the federal Constitution or conflict with federal statutes or treaties.[1] In 1998, the people of Nebraska amended art. III, § 2, to add the requirement that "[i]nitiative measures shall contain only one subject."[2] The peoples' power of initiative, and the self-imposed single subject limitation on that power, are of equal constitutional significance.[3] Just as courts must respect and give effect to the power the people have reserved to themselves to amend the constitution or enact legislation through initiative measures, courts must also give meaningful effect to the single subject requirement in art. III, § 2.

When analyzing the single subject requirement for voter initiatives under art. III, § 2, we apply the natural and

_____

[1] *State ex rel. Johnson v. Gale*, 273 Neb. 889, 734 N.W.2d 290 (2007).

[2] See 1997 Neb. Laws, L.R. 32CA.

[3] See, e.g., *State ex rel. Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006) (right to initiative and resubmission clause limiting that right have equal constitutional significance).

necessary connection test.[4] Under that test, the inquiry is whether all of the provisions of an initiative have a """"natural and necessary connection with each other, and, together, are a part of one general subject.""""[5] When there are separate provisions in a proposed constitutional amendment, they "must be closely related in purpose to be presented to the electorate for a single vote."[6] This is so because "[w]ithout a unifying purpose, separate proposals in a ballot measure necessarily present independent and distinct proposals that require a separate vote."[7]

When analyzing the single subject requirement, we are mindful that its purpose is to "avoid voter confusion and logrolling."[8] We have described logrolling as "the practice of combining dissimilar propositions into one proposed amendment so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately."[9] We also have described logrolling as "including favored but unrelated propositions in a proposed amendment to ensure passage of a provision that might otherwise fail."[10] Generally speaking, logrolling is criticized because it leads to the adoption of measures which, when considered separately, do not enjoy true majority support, and it presents voters with the "Hobson's choice" of either choosing to vote for a measure they dislike in order to secure passage of a measure they favor or, conversely, being

---

[4] See *Christensen v. Gale*, 301 Neb. 19, 917 N.W.2d 145 (2018).

[5] *Id.* at 32, 917 N.W.2d at 156.

[6] *State ex rel. Loontjer v. Gale*, 288 Neb. 973, 1000-01, 853 N.W.2d 494, 513 (2014).

[7] *Id*. at 1003, 853 N.W.2d at 515.

[8] *Christensen v. Gale, supra* note 4, 301 Neb. at 31, 917 N.W.2d at 156.

[9] *State ex rel. Loontjer v. Gale, supra* note 6, 288 Neb. at 995, 853 N.W.2d at 510.

[10] *Id.*

forced to vote against a measure they favor because it has been joined with a measure they disfavor.[11]

The plurality and dissenting opinions do not reach separate results because they disagree on any of these fundamental principles of our constitutional single subject jurisprudence. Instead, we reach different results because we have different views regarding the "subject" of the initiative.

We have observed that "whether a proposed amendment's provisions deal with a single subject matter depends on how narrowly or broadly the subject matter is defined."[12] Consequently, the judicial exercise of defining the subject of a ballot initiative is a critical first step. To do so, a court must discern the "primary purpose"[13] of the initiative.

As it regards the Constitutional Initiative, the plurality appears to have accepted the sponsors' framing of the initiative's primary purpose. The sponsors describe their objective as amending the constitution to authorize "all forms of games of chance . . . within licensed racetrack enclosures in the state." Similarly, the plurality defines the subject of the Constitutional Initiative as "ask[ing] voters if they want games of chance to be permitted within racetrack enclosures."

We reject the notion that a sponsor's articulation of an initiative's purpose must control the court's definition of the initiative's subject. To give meaningful effect to the single subject requirement under art. III, § 2, courts cannot allow the general subject of a voter initiative measure to be defined at such a high level of abstraction that the primary purpose of the single subject requirement—to prevent logrolling—is frustrated.

---

[11] See Richard Briffault, *The Single-Subject Rule: A State Constitutional Dilemma*, 82 Alb. L. Rev. 1629 (2019).

[12] *State ex rel. Loontjer v. Gale, supra* note 6, 288 Neb. at 1001, 853 N.W.2d at 514.

[13] *Christensen v. Gale, supra* note 4, 301 Neb. at 32, 917 N.W.2d at 156.

Courts and commentators alike have acknowledged the difficulty inherent in defining the subject of voter initiatives,[14] and we do not intend to suggest there is a simple mathematical or linguistic formula to correctly identify the subject of every initiative. Indeed, it has been suggested that when applying single subject rules, neither judges nor scholars have been able to define a "subject" with precision.[15]

We do not write separately to propose any new test for discerning the subject of an initiative. Rather, we faithfully apply our precedent which states that "the general subject of a proposed ballot measure is defined by its primary purpose."[16] When we review the Constitutional Initiative through this lens, we discern more than one purpose, and thus more than one subject.

The primary purpose of the ballot initiative is to amend the constitution to authorize "all games of chance" in Nebraska. This necessarily means it would authorize casino-style gaming. A secondary purpose of the amendment is to restrict that expanded gaming to only "licensed racetracks." The plurality does not appear to disagree there are multiple proposals inherent in the text of the initiative, but it concludes there is a natural and necessary connection between authorizing expanded casino-style gaming on the one hand, and deciding where such expanded gaming should be located on the other hand. If the purpose of the provision to restrict expanded casino-style gaming to racetracks was only to identify a geographic location for such gaming, we would agree with our colleagues.

But the purpose of the provision restricting expanded casino-style gaming to "within licensed racetracks" is not about geography. It is about money. This initiative does more than just

---

[14] See, e.g., Briffault, *supra* note 11.

[15] Robert D. Cooter & Michael D. Gilbert, *A Theory of Direct Democracy and the Single Subject Rule*, 110 Colum. L. Rev. 687 (2010).

[16] *State ex rel. Loontjer v. Gale, supra* note 6, 288 Neb. at 1002, 853 Neb. at 514. Accord C*hristensen v. Gale, supra* note 4.

identify the location where expanded gaming will occur; it also limits the type of businesses that can profit from hosting such gaming in Nebraska, and thus creates in licensed racetracks a constitutionally protected monopoly on hosting expanded gaming. Hidden in the folds of the question whether to authorize expanded casino-style gaming in Nebraska is the separate question whether only racetracks should be given an exclusive constitutional right to host such gaming. That separate question has neither a natural nor a necessary connection to whether expanded casino-style gaming should be authorized in the first instance. It presents a separate subject which, under art. III, § 2, must be put to the voters separately.

Combining the proposal to authorize expanded gaming with the proposal to limit such gaming to only licensed racetracks is a classic example of logrolling. Voters who may favor expanded casino-style gaming but oppose allowing only licensed racetracks to host and thus profit from such gaming are faced with an all or nothing proposition. Either they are forced to vote for something they oppose in order to obtain passage of what they support or, conversely, they are forced to vote against something they support in order to prevent passage of something they oppose.

The plurality finds a natural and necessary connection between expanded gaming and racetracks, because one form of gaming (horseracing) is already authorized at racetracks. Reasonable people can debate whether there is a natural connection between casino-style gaming and horseracing. But we can conceive of no natural and necessary connection between the proposal to authorize expanded casino-style gaming in Nebraska and the proposal to grant racetracks the exclusive constitutional right to host and thus profit from that gaming. Just as the favorable tax proposal in *State ex rel. Loontjer v. Gale*[17] was found to be a separate subject with no natural and necessary connection to expanded horse wagering, the

---

[17] *State ex rel. Loontjer v. Gale, supra* note 6.

favorable racetrack proposal here has no natural and necessary connection to expanded casino-style gaming. Simply put, the Constitutional Initiative here violates the single subject requirement because it fails the natural and necessary test, and is quintessential logrolling.

We would hold that the Constitutional Initiative violates the single subject rule and would find the Secretary of State has shown cause why the Constitutional Initiative should not be placed on the November 2020 ballot.